IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


UNITED STATES OF AMERICA,      )
                               )
                Plaintiff,     )
                               )
           vs.                 )  NO: 23-CR-909 MIS
                               )
OTHON JORGE ZAMARRIPA,         )
                               )
                Defendant.     )


TRANSCRIPT OF PROCEEDINGS
PRETRIAL CONFERENCE
BEFORE THE HONORABLE MARGARET I. STRICKLAND
UNITED STATES DISTRICT JUDGE
TUESDAY, JULY 8, 2025
9:01 A.M.
LAS CRUCES, DOÑA ANA COUNTY, NEW MEXICO


(Proceedings recorded by machine shorthand and
transcript produced by Computer-Aided Transcription.)
REPORTED BY:    VANESSA I. ALYCE CHAVEZ, CRR, RPR, NMCCR
                Federal Official Court Reporter
                100 N. Church Street
                Las Cruces, NM  88001
                Phone:  (575) 528-1430
                Email:  Vanessa_Alyce@nmd.uscourts.gov


UNITED STATES DISTRICT COURT
100 N. Church St., Las Cruces, NM  88001
(575) 528-1430

Appearances of Counsel:


        FOR THE UNITED STATES:

                UNITED STATES ATTORNEY'S OFFICE
                District of New Mexico
                200 N. Church St.
                Las Cruces, NM  88001
                BY:  JONI AUTREY STAHL, ESQ.
                     JACKSON K. DERING, ESQ.

        FOR THE DEFENDANT:

                SHAHARAZAD McDOWELL BOOTH,
                Attorney at Law, LLC
                P.O. Box 13806
                Las Cruces, NM 88013
                BY:  SHAHARAZAD M. BOOTH, ESQ.

                and

                BENJAMIN LAW OFFICE
                1013 E. San Antonio
                El Paso, TX 79901
                BY:  BROCK M. BENJAMIN, ESQ.


Also Present:  Stephani Legarreta, HSI case agent
               Ashley Rousse, USAO staff


                    UNITED STATES DISTRICT COURT
            100 N. Church St., Las Cruces, NM  88001
                        (575) 528-1430

(In Open Court at 9:01 A.M.)

THE COURT:  Good morning, everyone.  We're here for *United States of America versus Zamarripa.*

May I have entries of appearance, please?

MS. STAHL:  Good morning, Your Honor.  Joni Stahl and Jackson Dering on behalf of the United States.

MS. BOOTH:  Good morning, Your Honor.  Shaharazad Booth and Brock Benjamin on behalf of the defendant, who appears in person and in custody.

THE COURT:  Good morning.  We're here for a pretrial conference, so I'm going to go over my list, and anybody who wants to bring anything up can at the end of the hearing.  I'm going to address first the Government's omnibus motion in limine.  That's Document 89.  So I'm going to go through this with defense and see if there's any opposition to things in the Government's omnibus motion in limine.  So the first thing the Government's asking the defendants be precluded from introducing evidence or making arguments regarding is allegations of Government misconduct.  Ms. Booth, what's the defendant's position -- or, sorry, what's defendant's position on that?

MR. BENJAMIN:  Your Honor, Ms. Booth is handling this.  I had a request, and I believe Ms. Stahl had a request that was a little more pressing than mine:  Is there a chance we can impose on the Court to rearrange --

THE COURT:  Yeah, what do you want to do first?  Sure.

MR. BENJAMIN:  Your Honor, Ms. Stahl has a witness on a 902 certificate that needs to be proved as on or off.  And then I have a sentencing later on this morning in a different court along with a motion to recall that was previously set.  And so if we could do Counts 1 and 2 motion to dismiss would be my request.  To the extent the Court would consider doing that, I would appreciate it.

THE COURT:  Okay.  What exhibit is it you need a foundational witness for?

MS. STAHL:  Your Honor, it's the school record.  Let me see if I can get you a --

THE COURT:  Just give me a number or letter or whatever it's done by.

(Discussion off the record.)

MS. STAHL:  It's Exhibit Number 41.  It's a sign-out sheet from Desert Hills Elementary School dated December 16, 2022.

THE COURT:  Do you have your foundational witness?

MS. STAHL:  Yes.

THE COURT:  All right.  Go ahead.

UNITED STATES DISTRICT COURT
100 N. Church St., Las Cruces, NM  88001
(575) 528-1430

**MELISSA LEYVA**,

After having been first duly sworn, did make the following answers:

**DIRECT EXAMINATION**

THE COURT:  Go ahead, Counsel.

Q.  (BY MS. STAHL):  Good morning.

A.  Good morning.

Q.  Would you state your full name for the record.

A.  Melissa Leyva, L-E-Y-V, as in "Victor," -A.

Q.  Where do you work?

A.  Las Cruces Public Schools.

Q.  What's your title?

A.  Assistant director of information operations.  We do the student information systems.

Q.  Okay.  And how long have you worked in that role?

A.  In that role, I've been there for six years.

Q.  What did you do before you had this role?

A.  I was working in the actual schools as a front office clerk for six years before that.

Q.  And what are your duties in your current role generally?

A.  I oversee all the information operation systems, the data that we collect from parents that pertain to students as well as our check-in/check-out Raptor system.

Q.  So you mentioned this Raptor check-in/check-out.

Could you explain kind of generally how that works at the school?

A.   So our Raptor system is a system that we use to verify parents, guardians, emergency contacts, to check-in/check-out students when they are getting picked up or coming in late, as well as a visitor management system to have parents sign in to be cleared to be in our schools.

Q.   And this Raptor system, is it used at every Las Cruces public school?

A.   Every 42 schools, yes.

Q.   And that's kindergarten all the way up to high school?

A.   Yes, ma'am.

Q.   Where could you use this kind of tracking system?

A.   We using this system to ensure that we are verifying the parents of who they say they are when they sign students out, as well as making sure parents are cleared to be in our buildings.  It does a little background check of these parents.

Q.   And as part of your duties, do you have the ability to search and pull reports from the Raptor system?

A.   Yes, ma'am.

Q.   How long has Las Cruces schools been using the Raptor system?

A.   As far as I know, they have been using it for 12 years.  Since I started with the schools, we were using

it then.

Q.    And when a parent comes to the school, tell us how that sign-out process works very specifically.  Say, a parent is coming to check a child out early.

A.    If a parent is coming in to check out a child, they state which child they are picking up, they provide their ID, the registrar/front secretary will take the ID, verify that this person is able toe sign out the student, whether it be a parent, guardian, or an emergency contact.  They scan the ID if it hasn't already been scanned in the system, just, again, to match the name, date of birth with who is standing there.  And then they click the check-out button and release the student to the parent.

Q.    And you mentioned that the parent checks out whether that person is able to check the child out.  Where does the information come from about who is allowed to check a child out?

A.    So we do ask parents to do a registration at the beginning of every year which is online.  They are able to update who can pick up the child.  Parent/guardians, aunts, uncles, they can add whichever persons are able to pick up this child.  And then, once they submit it to the school, it automatically gets synced to the Raptor system.

Q.    And so would the Raptor system be able to give -- provide information about a specific date and exactly who

checked the child out?

A.    Yes, ma'am.

Q.    And how long do you -- how long does Raptor retain those records, if you know?

A.    I don't know.  As far as I've been in this position, it's -- we can pull any type of historical documents as long as we've put it in the system.

Q.    Okay.  And when you get requests to pull specific records, how do you go about doing that?

A.    So usually whoever is requesting usually starts off at the school.  The school will give them what they are requesting, and then they usually come to our office, in information operations at the central office downtown, and just verify that these are authentic records.

Q.    And are you the person that does that verification when it's needed?

A.    Yes, ma'am.

Q.    And I'm going to show you two things, with the Court's permission, what is filed as Document 127, the 902 certification, as well as the Government's proposed Exhibit 41.

      So do you recognize the certification?

A.    Yes, ma'am.

Q.    And did you sign that?

A.    Yes, ma'am.

Q.   And then do you recognize the document that's marked as Government's 41?

A.   Yes, ma'am.

Q.   What is that?

A.   That is the record that I pulled from the Raptor system showing that the parent picked up those children.

Q.   Okay.  And was this document created and maintained in the course of regularly conducted business?

A.   Yes.

MS. STAHL:  I would pass the witness, Your Honor.

THE COURT:  Go ahead, Counsel.

**CROSS-EXAMINATION**

Q.   (BY MR. BENJAMIN):  Good morning, ma'am.

A.   Good morning.

Q.   Did you work -- you said you used to be a front office clerk?

A.   Yes, sir.

Q.   Was that at Desert Hills Elementary School?

A.   No, sir.  I was at Oñate High School, and then I went to Conlee Elementary.

Q.   Okay.  Were you requested to provide -- I see an email that they requested December 16, 2022, records; do you remember that?

A.   No, sir.  I believe that went straight to the school first.  And then it came to our office.

Q. Okay. Did you provide any records in addition to the December 16th, 2022, records, that you're aware of?

A. Only what is -- I believe it's only that date that is on the exhibit.

Q. I'll represent there's only one date on there.

A. Yes, sir.

Q. Okay. And the Raptor system has been in place for 12 years, you said, right?

A. Correct.

Q. You mentioned the word "operator compliance." What's "operator compliance"?

A. So "operator compliance" is school, so meaning, our office staff is doing the operation as far as following process and procedure, as far as checking out the students.

Q. And are you aware of what operator compliance checks have been done at Desert Hills?

A. Unfortunately, I cannot testify if they are following the process. All I know is we have a process district-wide.

MR. BENJAMIN: And may I approach, Your Honor?

THE COURT: Uh-huh.

MR. BENJAMIN: I'm showing the witness what is marked as Government's 41, which I represent is the records.

Q. (BY MR. BENJAMIN): Have you had a chance to look at that?

A. Yes.

Q.    Does that look like it's a printout from the Raptor system?

A.    Yes.  So the way that Raptor is conducted is we go to our reports and we pull the specific date.  If it's requested, unfortunately, it pulls all the students, so we have to export it into Excel and then filter what specific date we are looking for, so it is the printout to Raptor.

Q.    When you say "all the students," you mean all Desert Hills, not just the Zamarripas, right?

A.    Correct.

Q.    And we're only interested in the Zamarripas, and there's three on there?

A.    Yes, sir.

Q.    And the event matched -- which is barely readable, but I think that's what that says.  Is that what that title probably is?

A.    Yes.  So it's just the top part where it shows the first name, last name.  It does show their ID number, when they were checked out; the type of event it was, which is a sign-out; and then it states who checked it out; meaning, either the parent was physically standing there; and then the other -- where it says "reason," so meaning "other" it could have been that they left for a vacation or what other reason that was not in our drop-down.

Q.    It says "operator assisted."  That means -- am I

assuming correctly that means somebody in the front office keyed that in? That wasn't a swipe or a --

A. Correct. That is someone that physically checked the boxes on check-out.

Q. But you'd said that you don't know what the operator compliance is at Desert Hills. Let me ask you this. If you don't understand the question, I'll try and simplify it.

A. Okay.

Q. The operator compliance at the Desert Hills, you said you don't have any personal knowledge as to whether they're following that; is that fair?

A. Yes.

Q. And so, if it's operator assisted, that means that a clerk keyed it in, and he could have -- Othon Zamarripa could have been there, or the clerk could have keyed it in saying that he was there; is that fair?

A. No. I think I misunderstood your question in first. I was talking in whole --

Q. Okay.

A. -- that -- but as far as this situation, that is someone actually keying it in.

Q. And can you, under oath, testify that that is what happened on December 16, 2022?

A. Yes, sir.

Q. Based on what?

A.    Based on this document.  This is a report that pulls from our system; that means that someone physically did the actual process of checking out.

Q.    And I think we're crossing in the night.

So somebody, an operator at the front --

A.    Our front office secretary, yes, sir.

Q.    Thank you.  Entered this in, correct?

A.    Correct.

Q.    If the common practice at Desert Hills is that the parent just simply calls and says, "Send out the child," that would still be reflected here, if the front office clerk keyed that in?

A.    So if in the situation a parent calls in and it is not this person, they would select which person is on the phone, but our process is not to allow them to check-out over the phone.  So could they have called?  Yes, but -- meaning they still received the phone call, and then they still processed the register -- or the check-out.

Q.    And if I'm on the other end of that phone and say, "I'm Othon Zamarripa," can you confirm that?

A.    So we have them ask a series of questions to verify. And the questions are always different:  What's your address?  What's the phone's number?  What's your child's teacher's name?  Again, we don't allow checkouts over the phone unless it's at the high school level because those

students drive.  So it's very unlikely that an elementary school would allow a check-out over the phone and then have the children wait outside for the parent.  Again, that is our process.  If the school did not follow it, I am not aware of them not following the process.

MR. BENJAMIN:  Pass the witness, Your Honor.

THE COURT:  All right.  From the Government?

MS. STAHL:  Just quickly.

THE COURT:  Sure.

### REDIRECT EXAMINATION

Q.  (BY MS. STAHL):  I think you alluded to this, but in your experience over the past six years, are you aware of any issues of noncompliance following the policy at elementary schools specifically?

A.  No, ma'am.

Q.  And are you aware of any issues of noncompliance at Desert Hills specifically?

A.  No, ma'am.

Q.  And would it be possible for an elementary student to check themselves out?

A.  No, ma'am.

Q.  And you already said, if someone called in, the person who was identified on the phone would be the person listed on that form; is that correct?

A.  Yes, ma'am.

Q.   So based on the information in that form and the policies and procedures, who does it appear checked out the children on the 16th of the December?

A.   Othon Zamarripa.  I'm sorry if I messed up the name.

MS. STAHL:  Thank you.

THE COURT:  All right.  Is the Government intending to call this witness at trial live as well?

MS. STAHL:  If necessary, we can, Your Honor. But we were hoping to just bring in the document without having to bring in the witness.

THE COURT:  From defense?

MR. BENJAMIN:  Your Honor, I'm looking for the same answer that was provided by the witness on cross in front of jury, so that's the basis for the objection.

THE COURT:  So we're on foundational objections. What's your foundational objection?

MR. BENJAMIN:  Your Honor, the Government was just looking to use the business records.

THE COURT:  Business record is not a foundational objection.  Do you have a foundational -- that's a response to a hearsay objection.  Do you have a foundational objection to this?

MR. BENJAMIN:  I don't have a foundational objection to this document.  I have an objection to a lack of a testifying witness.

THE COURT: All right. Thank you for your testimony. You're excused.

All right. So I'm going to find that a foundation has been laid. I didn't even see an objection to a foundation, but that's okay -- that was filed, but that's fine. So a foundation has been laid for Government's Exhibit 41. And I'm not going to admit the document at this time. I think there'll be a hearsay objection, and so you'll have to call your witness to testify at trial. So bring her here so the defense doesn't have to issue a subpoenas, since you already have access to her, okay?

MS. STAHL: All right.

THE COURT: All right. What else did you want to do, Counsel, before you had to go?

MR. BENJAMIN: Your Honor, if we could ask for Counts 1 and 2.

THE COURT: Okay. I'm not going to decide those here today, but I'll let you-all argue them.

MR. BENJAMIN: At the Court's pleasure.

THE COURT: All right. Go ahead. If you want to argue about it, go ahead.

MR. BENJAMIN: And, Your Honor, this is actually a fairly brief argument.

THE COURT: Okay.

MR. BENJAMIN: As the Court knows, I was recently

appointed.  And, more recently, the court decided *United States* -- or the Tenth Court of Appeals decided *United States versus Chavarria*.  And so the Government has argued that this motion should not be heard, should be denied as untimely.  I'm suggesting there's been a material change in the law and the motion should be denied as to Counts 1 and 2 because the federal jurisdiction for coercion and enticement is clear.  Your Honor, I'm suggesting that it's not untimely.

Chavira [sic], being a material change in the law, comes from a kidnapping case where it's a federal crime if the offender uses an instrumentality of interstate commerce in committing or in furtherance of the offense.  That's the same, almost word-for-word, language that's in the 2242(a) statute and, hence, in the motion.

The instrumentality out of *Chavira* says:  But what end was the instrumentality used?  And the Court there says, The Government is satisfied that merely some end is accomplished.  And the Court, on page 14 of *Chavira*, stated that that is too broad.  If everything that accomplishes an end falls within Congress' Category 2 commerce clause authority, the Government could regulate everything that moves.  The Constitution doesn't tolerate such extremities.

Your Honor, in this case, I would suggest that the Government's position, as we understand it -- and this

is the one of the reasons for the motion to dismiss or styling it in the alternative for a bill of particulars -- is that something was shown on the phone that's not located on the phone, to my understanding.  And so the argument is that the phone, because it's an instrumentality of commerce and just broadly an instrumentality of commerce, is made out of the state and comes into the state and, therefore, it's commerce.  That's the same thing as a BIC Number 2 pen [sic], Your Honor.  If I just was writing things on a paper and didn't mail them or anything else, it comes from out of state.  BIC's not in New Mexico.

And so the Court discusses a lot of different ideas there, but I think the issue that we have is two in this case, Your Honor, in the motion for Counts 1 and 2. One, they're not going to tie, I don't believe, other than through testimony, that there was a video or something shown on this phone; although, I think the reports that I've reviewed to date show that it's not a phone that was used, it was a PlayStation or a computer.  And so that's the basis for the clarification as to what was shown and how.  But then, even if something was shown, how did that affect the enticement in such that we yank a -- I'm going to say "sexual assault" because I'm from Texas, Your Honor, but a criminal sexual penetration out of New Mexico State Court into this court solely based upon the device that was

allegedly used to collaterally commit the offense?

And that's the same thing that the Court in *Chavira* dealt with directly, was that the vehicle was used to drive down the road where the body was either shot or dropped -- and it's not clear from that opinion -- but then comes back, but the fact is that three people got in the car and two people came back to the car. And so what this reminds me of, Your Honor, is the *United States versus De Leon*, that was also decided by the Tenth Circuit. And I didn't cite that, but that was a RICO case, Your Honor, where there was a drug trafficking murder that was alleged to have been committed. And the idea was it was a reprisal for a hand-to-hand drug transaction. And there the Tenth Circuit held -- and I could provide the case, Your Honor -- that --

THE COURT: Counsel, I was on that case with you. I was on *De Leon* with you, but go ahead. I know the case.

MR. BENJAMIN: And I just spent the weekend with five of my ranger buddies --

THE COURT: That's fine.

MR. BENJAMIN: -- and my memory is horrible.

THE COURT: All right.

MR. BENJAMIN: But the reversal there was the same thing, Your Honor.

THE COURT: Yeah.

MR. BENJAMIN:  Tangentially, we can't get there. And so I'm specifically dealing with Counts 1 and 2. Ms. Booth is going to deal with Count 3, but...

THE COURT:  Okay.  All right.

MR. BENJAMIN:  Thank you, Your Honor.

THE COURT:  Thank you.

From the Government?  Before you start, could you explain the new count, like, what the theory is behind that so I just understand?  I understand the other counts, but the new one.

MS. STAHL:  Sure, Your Honor.  The third count is we've charged the defendant accessed with intent to view material containing child pornography.  And basically the child protection laws were amended, I think, in 2018 -- I'd have to look to be sure, but to broaden the possession charge to include behavior in addition to just possessing the images.  And this would be if someone made efforts to access images of child pornography with the intent to view them.

THE COURT:  And your theory about how the defendant did that is what?

MS. STAHL:  In this case, the defendant was searching for a number of things on a secret Twitter account that was tied to him, but under a totally false persona.  He was using that persona to interact with minors on the

internet.  And as part of all that searching, we have searches where he was clearly asking for, searching for pornography related to 17-year-olds, which is a minor under the case law.  So for all -- all of that shows an intent to be looking for child pornography.  And the Government also can show that, within his Twitter -- in this side, secret account that's not tied to his actual name, but the side, secret account, he had at least six images that the Government has identified that we would allege are child pornography images that he interacted with in some way --

THE COURT:  "Interacted with in some way," like, clicked on or just it showed up on his feed?

MS. STAHL:  That would be the expert testimony, that there was some interaction with images.  It doesn't necessarily mean that there was a click on the video, but that there was some scroll or interacting within the Twitter application.  And I think, under case law, the intent to access it makes it somewhat irrelevant if he actually saw the images, if he had the intent to be looking for the images and he actually interacted with them.

THE COURT:  And his intent for looking at the images is you have some evidence that he went to Twitter and put in search terms for child porn.

MS. STAHL:  Search terms for porn and minor porn. I wouldn't say -- I don't want to overstate what the

evidence will show as far as, like, child pornography, but clearly an intent and a predisposition for a certain type of image that was minors.

THE COURT:  Like, what were the searches for?

MS. STAHL:  Well...

THE COURT:  That's okay.  I know I'm, like, springing this on you.

MS. STAHL:  No, no.  We have.

(Discussion off the record.)

MS. STAHL:  And then the other, just while I'm looking for that --

THE COURT:  Sure.  Go ahead.  Of course.

MS. STAHL:  -- in addition to that would be the behavior with the minor victims in this case, as well as the fact that there's this whole side identity very compartmentalized from his other interactions online.  He has search history that shows that he was searching where incidents of sexual abuse are reported to, what the definition of child pornography was, who --

THE COURT:  It's like a Google search that he was doing saying, "What is the definition of child pornography?"

MS. STAHL:  Yes.

THE COURT:  Okay.

MS. STAHL:  That's one of our exhibits.  And then, like I said, this fictitious account where it's

obviously the defendant's account, it's on his devices, but it's under the name of an individual --

THE COURT:  I understand --

MS. STAHL:  -- that's a female.

THE COURT:  -- I mean, he had a fake account, or allegedly.  Your co-counsel has something for you to look at.

MS. STAHL:  Oh, thank you.  I've got it right here.  Thank you.  So there's an Exhibit 81, if the Court would like to follow along, but it's basically all of the searches that he was looking at, and there's several that are teen-focused, "tiny teen" -- I don't really want to read all of these, but very specific -- "teen trans," "Snow White."  And that ties in also to a lot of victim testimony that he was showing them specifically pornography that was cartoonish, which also kind of supports the idea that this was a predator of children.

THE COURT:  Right.  I mean, outside sort of the allowed evidence for proclivity for this kind of thing, I'm trying to understand the basis of the count.

MS. STAHL:  Right.

THE COURT:  So the basis of the count is he goes onto Twitter; is that right?

MS. STAHL:  Correct.

THE COURT:  And then he searches for things that

would lead him to...

MS. STAHL:  He's searching for pornography that would lead him to receive images of child pornography. Understanding that Twitter -- you know, there's protections in place in these social media apps, but the reality is, if someone is looking for something, they can still find those images.

THE COURT:  Okay.  So a lot of times in these cases, they'll have, like, certain terms that are supposed to bring up this kind of material, like, I don't know, "preteen hard core."  Do you have any searches like that, or are these the searches here on Exhibit 81?

MS. STAHL:  These are just a sampling of the search terms, but I think most of the searches that he was searching for would be teen.  I don't think we have anything that shows preteen, but we do have the Twitter account that he's interacting with minors that are clearly under the age -- well, I would say "prepubescent," like, 12 and 11-year-olds.

THE COURT:  Okay.  And when you say "interacting with the Twitter account," you mean it could be just scrolling on his Twitter account?

MS. STAHL:  So I'm using those things interchangeably, and I should not.

THE COURT:  That's okay.

MS. STAHL:  So when we talk about the content, we are charging him with access with intent to view, I'm talking about some sort of interaction within his Twitter feed.  When I'm talking about engaging with minors, I'm talking about actual messages with minors in the app.

THE COURT:  On Twitter.

MS. STAHL:  On Twitter.

THE COURT:  So he sees a picture or something of an underaged girl, and he is messaging with her?

MS. STAHL:  Chatting with minors, yes, Your Honor.  And I think it's important to note that all the time that this is happening, he's doing it through an account that has a female profile pic, a female name, and is kind of holding himself out to be, like, a young woman.

THE COURT:  Okay.  What's he saying to these underaged girls or potentially underaged girls?  Is he asking them for photographs?  Is he talking about -- with them sexually?  Is he...

MS. STAHL:  We have -- Government's Exhibit 79 is kind of the overview of -- kind of the front page, for lack of a better expression, of the Twitter account where he's clearly asking for images.  But the interactions that we have with minors are not necessarily asking for images. It's more kind of, like, chitchat in the app to get to know that minor better.  We don't have any instances that I

think -- let me double-check.

(Discussion off the record.)

MS. STAHL:  I don't think we have any chats that specifically asked a minor for images, but I think collectively we have a lot of evidence that he was on there interacting with minors and he was on there asking for nudes and then he was on there searching for this teen porn that gets us enough to put it in front of a jury.

THE COURT:  Okay.  All right.

MS. STAHL:  And then to --

THE COURT:  Oh, sorry.  I'm just asking her my question about the new count, but I'm going to let her argue the motion.

MR. BENJAMIN:  That's fine, Your Honor.

THE COURT:  Okay.  Go ahead.

MS. STAHL:  Coming back to counsel's argument over *Chavarria*.

THE COURT:  Right.

MS. STAHL:  It's hard to know what will happen with *Chavarria*.  It's very new law --

THE COURT:  Yeah.

MS. STAHL:  -- but the opinion is clearly specific to whether a motor vehicle is sufficiently alleged as interstate commerce --

THE COURT:  Right.

MS. STAHL:  -- and the Court says it not.  I think this is a very distinct set of facts from *Chavarria*, for a lot of reasons.  First of all, the United States has demonstrated from day one, including in the Complaint, that they're alleging it's the internet; also the cell phone, but cell phone connecting to the internet.  So any way you slice it, I think that we've demonstrated that we were relying on an instrumentality that is well established under case law as an instrument of interstate commerce.

I don't think there's any issue or argument that *Chavarria* changes that, particularly in a case like this where Congress has a huge body of statutes and case law related to the intent that the Government be able to prosecute these crimes that take place over the internet that clearly have an impact on interstate and foreign commerce; and that's kind of the exchanging of child pornography and the engaging in this kind of behavior.

The other thing I would just note is the argument that, you know, in *Chavarria* was that it's kind of difficult to tie the vehicle to the crime.  Here, that's not the case.  The internet was used to show a child child pornography to get the child to engage in the behavior that's kind of demonstrated in child pornography, sexual behavior, and to normalize that behavior with the child.  So I don't think that there's any kind of break in the tangential

instrumentality crime.

So, I mean, we'll tie the phone to what was shown. I think the allegation was that -- or the representation was that we can't tie the phone because the pornography is not found on the phone. There are records that demonstrate that the defendant was searching for the types of images described by the -- or the types of videos described by the children, as well as using the search engines and the sites for pornography described by the children. And all of that is verified and borne out in the record. So I don't -- I don't think there's really any kind of comparison between *Chavarria*. Even with it being an unknown, how far it will go, I don't think it will go this far.

THE COURT: All right.

MS. STAHL: I don't have anything else --

THE COURT: All right --

MS. STAHL: -- unless you have questions.

THE COURT: -- you're good. Thanks.

Defense, do you want to say anything else?

MR. BENJAMIN: Your Honor, I think it's just, at this point in time, when the Court asks about Count 3 and the evidence that was raised to support Count 3, Your Honor, that's all, I understand, information that -- at least as far as I understand, was disclosed yesterday. And so I

don't think that there's -- I mean, we're going to object to that based upon just where it's at and where -- the timeliness of that.

THE COURT:  When was that evidence disclosed?

MS. STAHL:  Your Honor, we provided access to the phone.  And then we ultimately ended up providing access to, like, the cloud where all of these records are stored.  I can look back to the --

THE COURT:  All right.

MS. STAHL:  -- specific date.  We gave them a drive --

THE COURT:  That's fine.  When did you do it?

MR. BENJAMIN:  And, Your Honor, I'll represent that we've had the phone and an image of the phone and -- and that issue.  But what I'm saying is the idea that the 404 that's being alleged is...

THE COURT:  What?  Is what?

MR. BENJAMIN:  It is brand-new.  The idea that there's 404.  Because I disagree that what she's representing suggests what it represents [sic].  Because it's a --

THE COURT:  All right.  You said you didn't get it, so I'm trying to figure out when you got it.

When did he get it?

MS. STAHL:  So we made the phone available to

view on March 31st.  And then we actually provided the hard drive -- well, I could actually go back earlier than that.  We provided the hard drive to prior counsel with the iPhone dump -- iCloud dump of this material.  But the iPhone hard drive was provided on April 1st to Ms. Booth and then, I believe, to Mr. Benjamin on June 30th.

THE COURT:  All right.

MR. BENJAMIN:  And, Your Honor, I apologize if that was --

THE COURT:  That's okay.

MR. BENJAMIN:  -- inarticulate, but the text messages that Counsel is referring to have a phrase called "Toasty4struddel" that I learned about yesterday for the first time.  And that is coming in as 4- -- as -- the idea is that's 404 and those are those searches, but that's a theory and that's not, I think -- I think it's a stretch, Your Honor.  And so the issue I have is that -- I just want to make that objection there.

THE COURT:  Wait.  You want to make an objection to what?

MR. BENJAMIN:  To the idea that --

THE COURT:  To untimeliness?  To an idea?  I don't understand.

MR. BENJAMIN:  Your Honor, there's a case that the Government has had the phone, I think, for two years,

and if we're now expanding Count 3 to just survive Count 3.

THE COURT:  All right.

MR. BENJAMIN:  Because the Court's question was dead-on as far as:  What are the search terms?  What are the terms and everything else?  And that's a theory.

THE COURT:  Right.

MR. BENJAMIN:  And that theory is buttressed by evidence that was located on a drive that was produced, I believe, March 31st, Your Honor --

THE COURT:  Okay.

MR. BENJAMIN:  -- but that was evidence that was located and disclosed as:  "This is our theory of the evidence" this weekend, if that makes sense --

THE COURT:  Yes.

MR. BENJAMIN:  -- and that's where I'm at.

THE COURT:  The theory of the evidence supporting that count?

MR. BENJAMIN:  Yes, Your Honor.

THE COURT:  And so you're objecting to...

MR. BENJAMIN:  The idea that we're going to get into that type of evidence on that kind of theory this late in the game, Your Honor.  Because that's going to shift the idea of how -- those are not -- I guess, Agent Donald- -- I'm going to butcher his name.  He's been in front of me, obviously -- the FBI agent is -- he's going to change his

testimony to support that new evidence.  And I just think that that changes the theory of the case and the defense theory.  And so I just wanted to raise that that's where we're at based upon the Court's question.

THE COURT:  All right.  Thanks.

MS. STAHL:  I don't know if Counsel is referring to Max Weir from HSI, who is a forensic examiner.  But the FBI agents who are testifying are both blind witnesses, so they don't know anything about the facts of the case and won't be changing their testimony.

THE COURT:  I assumed that's who you're talking about, Counsel, the local guy that dumped the phone that we always have?

MR. BENJAMIN:  Your Honor, blind witnesses irrespective, if we cross them, they're going to change their testimony from what it would have been before that evidence was disclosed.

THE COURT:  No, they don't know any of the evidence, that's what a blind witness means, so --

MR. BENJAMIN:  They're going to be asked about if there were searching for "Toasty4struddel --"

THE COURT:  No, they're not going to be asked about that.  They're blind witnesses.  They have a guy who dumped the phone; is that who you're talking about --

MR. BENJAMIN:  Agent Weir, yes, Your Honor.  I'm

talking about all of them in general, and that's the issue, in my opinion.

THE COURT:  All right.

MS. STAHL:  And just to be clear, we alleged from the beginning that these images were in the Twitter account, and the Twitter account was always -- the reason we think it's intrinsic is the "Toasty4struddel" email is the one that ties back to the defendant, but that's what was used to set up this whole fake account.  And the images were always alleged to have been in that account.

THE COURT:  All right.  Okay.

Let's, then, go through -- Counsel, is that all you have?  Is that all you're dealing with today?

MR. BENJAMIN:  Thank you, Your Honor.

THE COURT:  Okay.  Then you're welcome to stay or leave.

MR. BENJAMIN:  Your Honor, my intention is to be here and just, as I said, pop out for the other hearing.

THE COURT:  That's fine.  Just pop out whenever you need to.

Okay.  Let's go through the Government's omnibus motion in limine.  So the first thing the Government has moved to preclude the defendant from bringing up is allegations of Government misconduct.

Ms. Booth?

(Whereupon Mr. Benjamin left the courtroom.)

MS. BOOTH:  Your Honor, I would just summarize, for pretty much all of 89, we don't have any specific objection to what's being asked here.  It's just guidelines for trial, which we will respect the rules and operate accordingly.  We're not trying to overstep those.  What we are saying when we don't object really to anything in 89, that doesn't apply to our responses in 93 and 95.

THE COURT:  So you don't have any allegations of misconduct?  I mean, obviously, you're going to criticize the Government's case, but no allegations that there was misconduct by an officer in some way?

MS. BOOTH:  No.

THE COURT:  All right.  And so then I would -- I mean, I understand why the Government files these omnibus motions in limine.  The defense does the same a lot.  I've tried a lot of cases with Ms. Booth and co-counsel at this point and so I assume -- I don't expect them to do any of these things, but if they do -- so I'll grant the motion. If -- you know, if defense trial strategy changes in some way and, for example, somehow defendant's health has now become relevant or something, come approach before you bring it up.  Don't bring up any of these things in opening.  And, obviously, if the Government thinks that something's happening that's improper, then bring it up.  And then, of

course, as far as all the character evidence goes against all the witnesses in this case, including, potentially, the defendant, we're going to follow the rules. We're going to follow all the rules of evidence and procedure. So 89 is granted.

Then Government's motion in limine to admit videos of Jane Doe and John Doe's forensic interviews. I'll hear argument if the parties want to argue it. It's a little hard to rule on these prior to seeing what comes out in trial. Normally, forensic interviews are not admitted basically because they're hearsay, but sometimes the residual exception applies or, I don't know, some other exception might apply. It might be meant to bolster credibility after they've been attacked, if the timeline works. There's a million ways it can come in or out, so I can hear the parties' argument or we could just wait and see what happens in trial.

MS. STAHL: The Court's absolutely right. It depends on how the direct and the cross go before this becomes an issue.

THE COURT: All right. Ms. Booth?

MS. BOOTH: We agree with the Court, Your Honor.

THE COURT: All right. Then I'll just reserve on 90, and we'll see what happens at the trial.

Obviously, given we don't know if these are going

to be admitted or not, I don't expect either side to argue about something that happened in the forensic interviews or talk about forensic interviews in opening statement.

Next is Government's motion in limine seeking reasonable accommodation of child victim witnesses, Document 91. I mean, you know, again, I don't expect either of the defense attorneys on this case to do anything aggressive or inappropriate with the child. So, I don't know, do you want to be heard on that, Ms. Booth, at all?

Sorry, Ms. Stahl, you were standing up. Did you want to say something?

MS. STAHL: I was just going to note that this was filed when there was prior counsel.

THE COURT: I understand. I noticed that. He's nice too. He just can't hear that well, but go ahead.

MS. BOOTH: Your Honor, we just note that -- the age difference between the children. While we will treat them age-appropriately, they are different in maturity, so we don't anticipate them being handled the same, but we will handle them with respect.

THE COURT: That's fine. I'll enforce Rule 611; you know, there's no harassment or embarrassment -- unneeded, I guess I should say, embarrassment of witnesses.

As far as leading questions goes, I'm going to allow leading questions. And if the Government thinks that

they are somehow not getting good evidence out of the children because of their age or just any other reason, that's always something that we can modify during trial. But I think -- I'll just say I think, with children in general, leading questions -- not overly leading and not too many and not confusing leading, but leading questions help us get to the point of the case; otherwise, it can just get really long and frustrating.  So I'll probably let the Government use some leading questions with the children as well as just to get to the point.

Let's do, then, Government's notice of intent to introduce evidence pursuant to 404(b).

From the Government?

MR. DERING:  Yes, Your Honor, according to our motion, we're seeking to include a lot in this case.  It's United States' theory that for the past four years, from 2018 to 2022, the defendant for this case was sexually abusing his stepchildren and, in doing so, a lot of conduct is relevant conduct, it's intrinsic conduct, it's conduct that goes to the state of mind, intent -- identity, intent, notice, preparation, and plan.  In addition, a lot of the conduct -- and I'll specifically go to Jane Doe for this case, Your Honor, just to start it off, because I know there's a lot of information in this motion that we want to get in.  When Jane Doe was three to four years old, she was

sexually abused by the defendant. She remembers the first time that it happened where he sexually abused her, and then another time where he woke her up in the middle of the night, took her away from her bed, and sexually abused her again. Even though that's not part of the charged conduct, which is 2018 to 2022, it is absolutely intrinsic. We want Jane Doe to be able to tell her story, Your Honor. To tell her story, she's got to talk about the first instance and how it happened and how things progressively got worse from that point. So we absolutely emphatically believe that Jane Doe should be able to talk about that evidence as intrinsic.

That is also an evidence standard for 414, because it's an act of sexual molestation. The defendant is charged with sexual molestation. It's very, very much relevant to this case, Your Honor, because it goes directly to defense's theory, which seems to be constantly changing, but the theory is that the mother for this case, you know, fabricated this entire scheme for the kids to lie, right? So it goes directly to credibility. So that's very important for this case, to be able to have the victim, Jane Doe, talk about what happened to her. It goes to the sexual abuse. It goes to the coercion that happened later on in the charged conduct. We would ask that the uncharged conduct comes in as 414 intrinsic and 404.

We also want to note we have a changing position

in prosecution for this case.  We noticed it up when it comes to Jane Doe going to the hospital, when it comes to her bumps.  We're not willing to pursue that line of testimony, Your Honor.  We don't want to have a trial within a trial of who gave John Doe [sic] some kind of virus.  That's not what this case is about.  So we're willing to discard that and not got into that at all.  We only think it's appropriate, when it comes to Jane Doe, to talk about that uncharged sexual abuse that I talked about.

THE COURT:  Okay.  Go ahead.

MR. DERING:  Yes, go ahead, Your Honor.

THE COURT:  Let me ask you a question.

MR. DERING:  Yes.

THE COURT:  So, first of all, you know, defense strategy does change, just like Government's strategy changes sometimes.  It's hard to do defense work.  It looks hard.  It's harder than it looks, and it looks hard.

So you think that the defense is that the mom is fabricating and coaching these children.  Why, if you know?  Like...

MR. DERING:  From my understanding, Your Honor, the defendant and his wife have had a tumultuous relationship.  They're the kind of couple that are on-again, off-again, they're filing for divorce, getting back together.  Based on that, the defense's position, I believe,

is that, based on the defendant not being with the wife anymore, the wife is taking it out on the defendant by having her kids lie to what the defendant did --

THE COURT:  Well, when did they --

MR. DERING:  -- and that is what we believe the argument is going to be for this case.

THE COURT:  When did they break up for good, like, that she'd be mad and fabricating info?

(Discussion off the record.)

MR. DERING:  Yes, Your Honor.  It's about at the time where Jane Doe made her initial outcry in 2022.  That's when they finally broke up, so that is what our belief is.  They're going to try to argue this is one elaborate scheme to get back at the defendant.

THE COURT:  All right.  So Jane Doe is going to testify -- or you-all want her to testify that when she was three to four years old, she was sexually abused by the defendant.  Now, apparently, also at some point, authorities, at least hospital authorities, got involved.  What happened then?

MR. DERING:  Yes, Your Honor.  From our understanding, child protective services investigated the case.  The defendant submitted -- and this is not anything that we're going to go into at trial --

THE COURT:  I know, but you tell me what --

MR. DERING:  -- but just for the Court's understanding --

THE COURT:  -- yeah.

MR. DERING:  -- the defendant submitted to a polygraph.  He was found to have deception.  So in other words, he was found to be lying about what actually happened with Jane Doe for this case.  Child protective services didn't do anything with it, but I don't think that has anything to do with the quality of the investigation.  That's entirely child protective service's purview and has nothing to do with this case.  In other words, they dropped the ball and that's why we're here in federal court today.  Based on that lack of investigation.

THE COURT:  So when Jane Doe was hospitalized -- so did the outcry from Jane Doe happen when she was hospitalized, or did she report that she had been sexually abused before that?

MR. DERING:  Your Honor, when Jane Doe was interviewed for this case -- or back in 2017 about the outbreak, she said that nothing was wrong; the defendant didn't do anything to her.  Of course, we're going to have expert testimony to explain how children compartmentalize abuse and how they don't want to get their offenders in trouble and how they love their offenders, if we're even going to get into that.  But that -- they did interview her,

42

and she stated nothing happened between her and the defendant.

THE COURT:  Okay.

MR. DERING:  She did state that the defendant got on top of her and squished her, which led us to believe, in many inferences, of what actually occurred.  But she was so very little, Your Honor.

THE COURT:  Yeah.

MR. DERING:  And based on what she said, it didn't lead to anything.

THE COURT:  And when she denied the abuse, was that in a Safehouse or a forensic interview?

MR. DERING:  It was, Your Honor.

THE COURT:  Okay.  And so then CPS is involved because she has a sexually transmitted disease.  And they are trying to figure out what happened and so they're polygraphing people who had access to her, including the defendant, but it just came out -- he didn't admit to anything and it just came out as deceptive, and then they had to just let it go?

MR. DERING:  And that's correct, Your Honor.  He made some kind of comment that maybe she got the virus from a community towel that they were using, which is obviously ridiculous, but that's what he said.  And then CPS did nothing with it.

THE COURT: Okay. All right. So, okay, you want in the sexual abuse of the child between three and four years old and what else for Jane Doe? What else do you want in from her, all the grooming and stuff?

MR. DERING: We want all the grooming. And when I talk about grooming, it's very specific to gifts and rewards. When the defendant was grooming Jane Doe for this case, he would give her gifts and rewards after and before the sexual abuse to groom her to be able to do those things. So we believe that kind of evidence is intrinsic and it's 404(b) evidence because it goes to preparation and plan, it goes to the identity of the defendant actually abusing her, and it goes to absolutely his intent of what he's doing to try to perpetrate that sexual abuse.

THE COURT: Okay. Anything else you want in for Jane Doe under 404, 414, or, like, intrinsic evidence?

MR. DERING: One other thing, Your Honor: We want to get in that she was forced to guard the door while her brother was being sexually molested. In this case, we're going to have testimony from both kids, sadly, that when one or another was being abused by the defendant, the defendant had them guarding the door while he was perpetrating abuse. That's very important. It goes to credibility, preparation, and plan, 404(b), and also goes to 414 because of the act of sexual molestation. So we believe

that her being able to guard the door and Othon telling her to do that is absolutely pivotal for this case of how the sexual abuse is happening and how he's using the kids against each other.

THE COURT: If I let in Jane Doe saying that when she was between three and four years old she was sexually abused by the defendant, what is your position on her telling child protective services that she wasn't being abused, that he got on top of her and squished her?

MR. DERING: Your Honor, in talking with co-counsel briefly, we think that's absolutely appropriate. We've asked Jane Doe why she said what she said. She was trying to cover for the defendant. She didn't want to get him in trouble.

THE COURT: That's fine. I mean, you can have her explain it.

MR. DERING: Yeah, so if defense wants to bring that up, we're more than willing to put that forth to the Court.

THE COURT: All right. Go ahead, then, on John Doe, what you want in from him.

MR. DERING: Yes, Your Honor, the most important thing for John Doe is we have sexual abuse that was happening, a lot of sexual abuse throughout four years. The majority of the sexual abuse for John Doe occurred in 2020

during the time of COVID.  During the time of COVID, as everybody knows, everybody was staying home, everybody was together.  To the unfortunate [sic] of the kids, they had to spend more time with the defendant in 2020.  When that was happening, of course, the defendant, as the United States will allege, was sexually abusing both the kids, but he was also physically abusing John Doe for this case.  The physical abuse is pretty gruesome when it comes to him having to eat dog feces, having to see the spiderwebs; him having to undergo grueling exercise routines; him having to -- strangled by the defendant.  We're going to have testimony that John Doe was strangled and then he woke up at a place different from where he was.  And the defendant was heard laughing when he woke up, and his body was tingling.  That is absolutely intrinsic.  It goes to grooming.  It goes to what everything the defendant was doing.

In this case, the jurors are going to ask themselves, Your Honor, how come it took them four years to talk about the abuse, the initial outcry.  Well, this absolutely explains it.  The defendant had a stranglehold over John Doe.  He was physically abusive.  He threatened to kill him.  He did whatever he could to make John Doe do exactly what he wanted.  We think that evidence is intrinsic.  We think it is 404(b).  It has everything to do with grooming.  It will be corroborated by expert testimony

how somebody grooms somebody to have them engage in sexual abuse.  It doesn't have to be sexual abuse, per se, it has to be physical abuse.  So it's that mental wrap that defendant had on John Doe, Your Honor, that we want to get in through John Doe when it comes to physical abuse.

Starting with that -- I think that's incredibly important -- we do have other acts, Your Honor, about the defendant holding a knife and threatening to kill John Doe; the defendant getting mad and punching John Doe in the stomach, knocking the air out of him, which he estimates happened 60 times.  We have the defendant taking John Doe to the Rio Grande and telling Sebastian if he did run, he would punch him in the back of the head.  We don't want to be particularly limited.  Even though a lot of these stories may become a little cumulative, John Doe still has to tell his story about the physical abuse.  John Doe is not going to go into detail about all the physical abuse because we're trying to get exactly what we're trying to prove at trial, but we want John Doe to be able to tell his story about how the defendant treated him and how basically John Doe thought if he didn't engage in sexual abuse after he watched pornography or did anything else, he would be killed, you know, he would be physically abused.  So it goes all to that intrinsic back-and-forth dynamic between the defendant and John Doe.

47

And Your Honor, we have some uncharged sexual abuse of John Doe that I just want to highlight, an incident where the defendant's grabbed Sebastian's butt.  The defendant told him to open up his legs and kicked Sebastian in the groin area; an incident where defendant grabbed John Doe by the testicles and threw him across the room.  These are lot of things that, you know, the United States believes will help this case, but like I said, Your Honor, we're not going to go into deep detail about the physical abuse.  We just want to give the jury whatever John Doe is willing to testify to, unrestricted, of what happened to him, and then we're going to go into the sexual abuse.  We're going to go into the coercion and enticement.  We're going to go into the phone, into the pornography, but we want John Doe to be able to tell his story.  It's very difficult for children to parse out things that happened, especially years ago, so we want John Doe to be able to tell his story unrestricted in that manner, Your Honor.

THE COURT:  Okay.  Anything else, then, as to your motion on 414, 404, and the intrinsic evidence?

MR. DERING:  Yes, Your Honor.  To close entirely, I mentioned the kids guarding the door while one or the other is being sexually abused.  John Doe is going to testify to that fact as well, so we would ask that he be able to testify to, I believe, the first instance where he

walked in on his sister engaging in sexual abuse with the defendant.  And after that, he was told to guard the door. That stuff is very important when it comes to the continuing abuse, so we would ask also that that testimony be allowed as well.  And that's what we'll conclude with.

THE COURT:  Okay.  Walking in is just being an eyewitness to a crime, so I don't see how that would be out, but guarding the door --

MR. DERING:  Yes, but John Doe will estimate for the case that 10, 20 times he was told to guard the door while his sister was being sexually molested.  The Court can limit that as the Court will, but I just want to acknowledge that although he was a witness to a crime, he continued to guard the door, he continued to facilitate the sexual abuse because that's what the defendant was telling him to do.  So that's other testimony that we seek to get in to this Court.

THE COURT:  What's the Government's theory on how both of the children knew that they were guarding the door while sexual assaults were happening against one another?

MR. DERING:  Yes, Your Honor.  Specifically, John Doe walked in on his sister and Othon, being sexually molested.  From that point on, he knew what was happening. The defendant took him outside the door, he strangled him, and he said something to the effect, "If you tell anyone what you just saw, I'm going to kill you."  And then, from

that moment on, Your Honor, he was guarding the door.  So he knew exactly what was happening and what he was doing that for.

We also have testimony, I believe, Your Honor, of Jane Doe.  She knew what was happening with Sebastian.  I believe they talked about the abuse between each other.  And based on that, they both have knowledge of why they were guarding the door.

THE COURT:  Okay.  All right.  Thanks.

MR. DERING:  Thank you.

THE COURT:  Ms. Booth?

MS. BOOTH:  Thank you, Your Honor.  Your Honor, I think that this -- and the Government's argument only highlights further what was stated by co-counsel -- this is a state case that's being overblown into a federal case. And even in everything that the Court is hearing today, what we're missing is that jurisdictional link.  And I just bring that up, even though it's not technically part of what we're here to argue, because I do think it underlines what's been happening here.  Inevitably, none of the allegations that the Government talked about involve any kind of use of any kind of interstate commerce whatsoever.  And they want to backdoor all of these allegations, which there have been CYFD call-outs, police reports on all of those things that have -- upon those agencies, and whatever the Government's

opinion is of those agencies is irrelevant.  They're state agencies that made a determination and charges were not filed.

THE COURT:  All right.  Let me just ask, because I thought, I might be wrong, that there were allegations that he set up cameras.  And did -- what's the Government's theory on that?

MS. STAHL:  Your Honor, if I may?  It ties to the motion that I have about the prior investigations.  But, actually, the interstate commerce is not included in the intrinsic 404(b).

THE COURT:  I know it's not, but we're just talking about it so --

MS. STAHL:  Okay.  Just to be clear, for Jane Doe, the allegation is that the defendant showed her pornography and coerced, enticed, persuaded, however, to -- her to engage in similar conduct.  That's the reason we're alleging that the prior abuse is 414.  It's not part of the time frame for the charged conduct.

THE COURT:  Okay.

MS. STAHL:  For Sebastian, it's very clear the grooming process is a lot more direct as far as kind of traditional coercion and enticement.  The defendant started showing him pornography, started touching himself, started getting John Doe to engage in this sort of behavior with

him.  So it's kind of -- both of them are, it's alleged, the same behavior, but kind of took place in different ways for both victims.  What the Court is thinking about is the allegation that the minor female made that the defendant recorded one of those acts --

THE COURT:  Right.

MS. STAHL:  -- which is alleged.  But that wasn't really the instrumentality that was charged, if that makes sense.

THE COURT:  The instrumentality is using the internet and the, you know, cell phones to groom?

MS. STAHL:  Correct, to show the pornography, to get the child to engage in that kind of behavior, to normalize sexual behavior and get the child to engage --

THE COURT:  Okay.  And that's the -- okay.  And then the...okay.  So the phone -- the videotape or the taking pictures of Jane Doe with a camera is not being used for jurisdiction?

MS. STAHL:  No, Your Honor.

THE COURT:  Okay.

MS. STAHL:  Because that's more the piece where we have to show that the conduct that was engaged in would have been a crime of production, but we didn't charge production.

THE COURT:  Okay.

Go ahead, Ms. Booth.  Sorry.

MS. BOOTH:  Your Honor, we would ask that if the Court allows this 404 evidence and everything contained in this motion that we be allowed then to reopen the conversation about the mother of these children.  During this time, there were CYFD reports that are alleging the mother of these abuses; pictures that were taken that are being tied to the abuse that the mother is having; specifically, even to the hands of John Doe.  The virus that we don't want to talk about, they don't want to talk about it because the mother is the one who tested positive for a matching virus.  So they want to keep out what is actual, I believe, substantive evidence and relevant evidence, Your Honor, and they want to backdoor all of this information while hiding from the jury that a lot of this stuff was investigated, that a lot of this stuff was -- it was contemporaneous, right?  So CYFD calls-out are being made by family members, by Othon himself, and by -- I shouldn't say that, but I know by family members, but they are in relation to his wife at the time having these kind of abusive relationships with these children.

THE COURT:  Okay.  So there's a CYFD report that I assume is made by people at the hospital.

MS. BOOTH:  No, Your Honor, there are several CYFD reports.

THE COURT:  Okay.  But is there one from the hospital?

MS. BOOTH:  I don't specifically know, but I know CYFD was called out.

THE COURT:  When she went to the hospital?

MS. BOOTH:  Correct, Your Honor.

THE COURT:  And do you agree with the Government's assessment of what happened with that investigation?  The little girl had herpes; they asked her what happened; she denied sexual abuse; your client was polygraphed and showed deception; and then that was the end of that case?

MS. BOOTH:  Correct, Your Honor.

THE COURT:  Okay.  And then what are the other CYFD reports about?

MS. BOOTH:  Your Honor, I'd have to specifically pull them all up, but they're as to physical abuse.  I think there's at least one towards Othon, but I believe it's simultaneous with this.  And then there are prior ones alleging -- her name is Judith Zamarripa, her abuse of the children.

THE COURT:  Physical abuse of the children?

MS. BOOTH:  Correct.

THE COURT:  No other allegations of sexual abuse of the children?

MS. BOOTH: I don't believe specifically with CYFD call-outs, but I don't want to misrepresent to the Court.

THE COURT: Well, what about other -- what about -- anybody else allege anybody else sexually abused these children ever?

MS. BOOTH: No --

THE COURT: Okay.

MS. BOOTH: -- no, no, no, there's no other person being alleged.

THE COURT: Okay. So the CYFD reports are about physical abuse by the mother on the kids?

MS. BOOTH: Correct.

THE COURT: And what happens with those? They just all get -- oh, I don't know. What happens?

MS. BOOTH: Your Honor, as far as we can tell, those were investigated and unsubstantiated or there were safety plans. We were not provided more than just that initial, as the Court's familiar with, kind of two-page document that you get.

THE COURT: Okay. And why do you think those are relevant or in? Or why do you want those in? How do you think you get those in?

MS. BOOTH: Your Honor, we believe that the relationship between Othon and his soon-to-be ex-wife is

extremely relevant, but the allegation here, Your Honor, arises in December. There is -- my client goes to Mexico and essentially tells Judith, "I'm done. I don't want to do this anymore." She then replies to him that he'll pay for making that decision, and then these allegations happen; then this investigation happens. There are -- after extreme work on her end to ensure that he is arrested. The other side of that, Your Honor, is they want to pin this abusive relationship -- or this abuse that's happening to John Doe solely on my client, even having direct evidence to the contrary. Because of that, Your Honor, I believe that we should be allowed to note that the bruises and things that may be pointed out to because it's on one of their exhibit lists, Your Honor, that there are actually CYFD reports that allege that his mother is the one that's actually abusing the child. So if they're going to talk about bruises or if they want to show this picture of bruises and they want to talk about abuse allegations, then I believe that this it is relevant; that we can show evidence that, at that time, somebody else was being reported for those abuses.

THE COURT: Who made the reports to CYFD that said the mom was abusing?

MS. BOOTH: I believe the specific one that I'm referring to remained anonymous, but I'll have to pull it up and let the Court know specifically.

THE COURT: Okay. Okay. So let me just make sure I understand. So defendant goes to Mexico, breaks up with girlfriend or whatever. She says, "You will pay." And that is -- how does she say that? By text? By phone?

MS. BOOTH: I believe by text, Your Honor.

THE COURT: Do you guys have the text?

MS. BOOTH: We should. That was part of prior counsel's, so I was trying to find it before I stood up, Your Honor.

THE COURT: That's okay. She says, "You'll pay." Then you said, "She went to extreme work to get him arrested." What do you mean by that?

MS. BOOTH: Your Honor, this is just information and belief, but we have, through the divorce -- records of them going through divorces. It was also -- at some point in time during all this time, she was posting on Facebook. I know this because I was a member of the community watch page on which this -- when Judith Zamarripa was posting on Facebook that nobody was doing anything about this.

Her counsel in the divorce was also posting on Facebook about this particular incident --

THE COURT: Who was her counsel?

MS. BOOTH: Sarah Van Cott, Your Honor.

While not naming the client, Your Honor, I know that it was about this incident and how law enforcement

isn't caring, and they were going to work making sure that justice was had.

THE COURT:  Okay.  And so when you say "extreme work to get him arrested," you mean for these sexual abuse charges?

MS. BOOTH:  Correct, Your Honor.

THE COURT:  Okay.

MS. BOOTH:  Well, to -- correct, Your Honor.

THE COURT:  Okay.  No other ways she was trying to get him arrested?

MS. BOOTH:  I guess I'm unclear on the Court's question.

THE COURT:  Like, so I just want to make sure I understand.  You said that the mother went to extreme work to get the defendant arrested, but that was just as to she was trying to get him arrested for these counts of sexual abuse against her kids?

MS. BOOTH:  Correct, Your Honor.

THE COURT:  Okay.  And then you say defendant has direct evidence to the contrary.  What's that?

MS. BOOTH:  Your Honor, that's when we were talking about the abuse -- I know that the Government intends to show the bruise picture as well as we have this entire motion of the extreme abuse that John Doe was going over.  We have evidence that CYFD is used by this family,

and yet none of these allegations, not a single one, makes it into a single one of those CYFD investigations.

THE COURT:  Okay.

All right.  So just so we -- I'll go back to you, I promise.

MS. STAHL:  (Indicating.)

THE COURT:  So, Ms. Booth, so that I'm -- we've gotten a little bit off track, which is totally fine.  So what is your response, though, to the, you know, 404 or 414 or intrinsic evidence that the Government went over as far as Jane Doe goes?

MS. BOOTH:  Your Honor, I think our response covers why we believe it's excessive and prejudicial.  I don't believe it's necessary, unless the Court has specific questions, to go back through my response as to those issues that we had, so we don't surrender those issues.  What I want to bring up is more geared towards what I heard in counsel's allocution.

THE COURT:  Okay.  Okay.

All right.  If I let in Jane Doe saying that she was sexually abused between the ages of three and four, I don't -- well, I guess the Government doesn't even want to let in the hospital stuff where she was diagnosed with herpes.  What's your position on the -- on Jane Doe denying abuse, just saying that he got on top of her and squished

her and that she may have gotten -- well, I guess, if we're not letting herpes out, we won't even talk about the towel, but her denying and her saying he got on top of her and squished her?

MS. BOOTH:  Yes, Your Honor.  We believe the entire forensic interview becomes relevant and we can -- I don't believe the forensic interview asked -- not that we want the video played --

THE COURT:  Right.

MS. BOOTH:  -- not that we want the entire transcript played [sic] --

THE COURT:  Right.

MS. BOOTH:  -- I just want to be clear that the forensic interviewer, in my recollection, does not ask about the herpes other than maybe to ask her if she knows why she is here, and that relates to, you know, her having issues urinating and things like that.  But I don't believe they talked more specifically about the medical concerns.

THE COURT:  All right.  So -- and you're talking about the forensic interviewer, you're talking about the forensic interviewer from the 2017 --

MS. BOOTH:  Yes, Your Honor.

THE COURT:  -- not the most recent one.

MS. BOOTH:  Yes, Your Honor.

THE COURT:  All right.  Anything else, Ms. Booth,

on that?

MS. BOOTH:  Just that, Your Honor, again, we don't surrender any of the arguments we made in our response.  Specifically what we would like to know, if this motion is granted, we believe, then, it opens the door specifically to all the other CYFDs, why those calls were made, and, specifically, also to the 2017 forensic interview.

THE COURT:  Okay.  All right.  Thank you.

MS. BOOTH:  Thank you, Your Honor.

THE COURT:  Oh, sorry, Ms. Booth.  Let me ask you another question:  In the 2017 interview, besides -- I mean, I guess the victim says it just didn't happen; she says the guy swished her.  Anything else besides just her denials basically --

MS. BOOTH:  Other than --

THE COURT:  -- that you think comes in?

MS. BOOTH:  The forensic interview goes to great lengths to get her to make a disclosure about Father, and I believe that is also relevant.

THE COURT:  Okay.

MS. BOOTH:  She brings out dolls, she brings out -- and I think their expert, I think, should be prepared to state all of the things that she used in order to try to get this child to make that disclosure.  It's not a forensic

interview, as I know this Court has probably seen, where they say, "Do you know why you're here?"  They say, "No."  They say, "Well, does Daddy touch you?"  And, obviously, I'm being a little bit simple, but once the denial happens, the interviewer doesn't quit, the interviewer tries to get a disclosure from the child.

THE COURT:  All right.  Thank you.

From the Government?

MS. STAHL:  Your Honor, this segues into our Document 95, and I just want to make sure it's very clear, because we're kind of mixing the record here --

THE COURT:  That's fine.

MS. STAHL:  -- but all of the CYFD stuff happened prior to the time of the charged conduct.  The only 404 or 414 that we're asking to bring in that is outside of the time of the charged conduct is Jane Doe having this instance of abuse when she was three or four years old.  And we specifically want to be able to keep out all of the herpes stuff because it creates this whole side trial.

THE COURT:  I understand.  So the CYFD reports that we're talking about were made when?

MS. STAHL:  So there was one on February 14th, 2024 -- excuse me, 2014 --

THE COURT:  2014.

MS. STAHL:  -- and it was --

THE COURT: That's okay, just give me the dates for now.

MS. STAHL: Okay. And then there was -- between November and December of 2015, there were multiple domestic incidents, but the only other CPS event was on December 16th of 2015.

THE COURT: Okay.

MS. STAHL: And then December 22nd, 2017, that was when they were dispatched to the hospital.

THE COURT: Right.

MS. STAHL: And then December 28th, 2017 -- oh, sorry, that was when she was forensically interviewed. That was still the same incident. And then the only other reports are a call on February 21st of 2020.

THE COURT: Okay.

MS. STAHL: And that was the one involving both -- I believe both the defendant and Judith. And then I just want to make sure those are all that we -- and then there was an incident involving physical abuse with Judith, an allegation of Judith abusing Rubin, or Othon's -- I think it's Othon, Jr., in September -- excuse me, August 23rd of 2018.

THE COURT: Okay. So it looks like there were two potential -- are these all CYFD reports or are some of these just call-outs, like, cops coming to the house?

MS. STAHL: They're -- all of them are CYFD --

THE COURT: Okay.

MS. STAHL: -- reports except for that in November, December, there were multiple dispatches to the house for domestic stuff.

THE COURT: What year? Of what year are we talking about? Where it was just dispatched.

MS. STAHL: Correct.

THE COURT: What year? Was that the 2015?

MS. STAHL: That was in November and December of 2015.

THE COURT: Okay. So in 2020 and 2018, there were CYFD reports saying that Mom was abusing the kids physically.

MS. STAHL: So just to be very specific, in 2018, there was an allegation by Victoria Galarza, which I believe is Mr. Zamarripa's first wife and the parent to the older children, saying that Judith, which would be stepmom, hit him to hurry him up, and he didn't have any marks or bruises.

THE COURT: Mom -- this is one of the victims?

MS. STAHL: This is not anybody that's involved in this case. This is one of the older children --

THE COURT: Okay.

MS. STAHL: -- from Mr. Zamarripa.

THE COURT:  Mom hit an older kid?

MS. STAHL:  Yes.  The allegation is stepmom, Judith --

THE COURT:  That's what I meant.

MS. STAHL:  Okay.

THE COURT:  Stepmom hits older kid is the allegation in 2018.  What's the allegation in 2020?

MS. STAHL:  That CYFD responded because one of the children had facial swelling on the nose who said that the mom -- or Judith threw her on the floor and told her not to tell anyone.

THE COURT:  And that is Jane Doe?

MS. STAHL:  No, that is another one of the children --

THE COURT:  All right.

MS. STAHL:  -- that's not part of this case.

THE COURT:  Any allegations during the charging period that the mom hit one of the victims in this case?

MS. STAHL:  There have not been any allegations at any point in time that Judith hit either of the minor children in this case.

THE COURT:  What about the bruise that Ms. Booth is talking -- there is some bruise photo that Ms. Booth is talking about.

MS. STAHL:  The minor child identified

Mr. Zamarripa as the person who hit him. And the mom, Judith, actually defended him, and the child was upset. But we're not seeking to bring in that incident because it's prior to the time period. We are only asking to talk about the abuse that occurred during this period. So the abuse that occurred during the charged time frame has not been investigated.

THE COURT: All right.

Ms. Booth, go ahead.

MS. BOOTH: I guess, you know, we get accused of changing our theory, Your Honor, but they literally admitted it as an exhibit and now they're, like, we --

THE COURT: Yeah, what exhibit is it or what number? Or whoever knows can let me know. I just want to look at it. Or do you know?

MS. BOOTH: Your Honor, it's 32.

THE COURT: Thirty-two. Okay. Go ahead.

MS. BOOTH: Just that it's admitted -- I mean, it's being requested as -- on their latest exhibit list which was filed last night -- 32, screenshot of bruise on Sebastian dated October 2015.

THE COURT: That's fair.

Counsel, do you want to admit this, not admit this? Tell me about this. Because that's fair, Ms. Booth thought that -- yeah.

MS. STAHL:  Right.

(Discussion off the record.)

MS. STAHL:  Your Honor, and, again, I understand that things evolve as you prepare for trial.  As we meet with and prep the minor victims, sometimes they don't talk about the things we expect them to talk about.  So we do not intend on admitting that exhibit or talking about the abuse related to the CYFD investigation.

THE COURT:  Okay.  So this photo of the kid's face says "October 2020."

Ms. Booth, is there a CYFD report during the time -- during the charging time frame, so 2018 to 2022, that says the mother was inflicting abuse on these kids?

MS. BOOTH:  No, Your Honor.

THE COURT:  Okay.  Okay.

MS. STAHL:  And just to correct the record, Your Honor, co-counsel just noted for me the picture of the bruise is actually from the time period, so I misspoke when I said that.

THE COURT:  Is from the what?

MS. STAHL:  It's from the date range in the Indictment.

THE COURT:  You're right.

MS. STAHL:  It's not related to the charge that CYFD investigated.  The picture's separate.

THE COURT:  Okay.  Okay.  All right.

MS. BOOTH:  Your Honor, we would just note one other thing as to why Mom is relevant.  She works for CYFD and has been working with CYFD, we think, at least since 2022.

THE COURT:  What does she do for CYFD?

MS. BOOTH:  Your Honor, we don't know.  We believe -- I don't know.

THE COURT:  All right.

MS. STAHL:  If I could, Your Honor?

THE COURT:  Go ahead.

MS. STAHL:  Just about the herpes, I just want to make sure that's clear.  We had not intended -- and the reason we filed a motion to keep that out, we had not intended to introduce anything about that because the type of herpes that the minor victim contracted, we don't have any way of proving that the defendant had that herpes.  We considered getting a blood -- a warrant to try to do a test, but we couldn't really prove a time frame for that, so it creates a whole issue.

THE COURT:  Yeah.

MS. STAHL:  But what we do know is that -- and all of this was disclosed in discovery -- the type of herpes that the mother had is not the same type of herpes that the minor had.  So any allegation that the herpes came from the

mother is refuted by medical evidence.  And that is the reason that we have noticed up Dr. Williams, who actually treated the minor, as kind of a potential rebuttal witness, if needed.  We don't intend on calling her in our primary case because we just think that the herpes situation gets into a big mess, and it's prior to what we're actually alleging in this case.

THE COURT:  All right.  Ms. Booth, do you agree with that, that it's a different strain of herpes?

MS. BOOTH:  I mean...

THE COURT:  Do you refute that?  Have you got something for me?

MS. BOOTH:  No, Your Honor, I have no reason to refute that.

THE COURT:  All right.

MS. BOOTH:  Again, Your Honor, our goal is not to go into the herpes allegations, Your Honor, but I think that we need to start carefully tailoring how it is that that 2017 allegation comes to needing to be investigated.

THE COURT:  I mean, you want it -- I don't know what I'm going to do, but if I let in the 2017 investigation, you want in that this little girl got herpes, denied your client did it, but said he got on top of her and squished her, and then your client was deceptive in his polygraph?

MS. BOOTH:  No, Your Honor.

THE COURT:  What do you want?  I mean, that's part of the investigation.  What do you want in?

MS. BOOTH:  Right, Your Honor.  We are trying to tailor and specifically make this...

THE COURT:  Yeah, yeah.

MS. BOOTH:  What we are trying to get in, Your Honor, is her inconsistent statement at that 2017.

THE COURT:  Well, and the Government said they agree with that.

MS. BOOTH:  Right.

THE COURT:  I mean, maybe we'll have to figure out exactly, like, how to get that in.  She denied it 10 times or 20 times, I don't know, whatever happened in the tape, but they agree that they get to impeach her with basically a prior inconsistent statement that he didn't do it.  Is that all you want in as well?

MS. BOOTH:  Yes, Your Honor.  And we do also believe, though, that we should be able to say that charges were not filed at that time with the investigator.

THE COURT:  I mean, how would they be?  She denied it.

MS. BOOTH:  I believe the polygraph should be allowed in, Your Honor, because I did give the polygraph to an expert who had concerns.  We were supplied with all of

the information for the polygraph.  And if we're going to get into it, then we would have an expert fight on whether or not that polygraph was done properly, which I'm not trying to get into.

THE COURT:  I mean, no.  And I get it, I totally understand it, but I just -- like, if we start saying what charges didn't get filed, don't we get to -- doesn't the Government get to say what all evidence there was?  I mean, the cops had a deceptive polygraph from your client, and they had a statement from this little girl that he got on top of her and squished her.  And you feel like, well, it wasn't enough?

MS. BOOTH:  If the polygraph is allowed in, then we would want to, then, ask that as a rebuttal; we'd talk about the issues that were with the polygraph.

THE COURT:  Okay.

MS. BOOTH:  So I think if we can do the prior inconsistents, say that this is -- there were no charges at the time.  And they get -- I mean, they're talking about bringing in immense amounts of evidence of child abuse, both by gifts and bribe -- apparently, my client grooms by both gifts and bribes and beating the crap -- so apparently everything.  My issue with grooming is all things are grooming.

THE COURT:  Yeah, yeah.

MS. BOOTH: If they're going to bring all of that in, we should be at least be allowed to bring in that investigations were being had in the home and there have been no charges in that time.

THE COURT: Okay. All right. I'll think about it.

Anything else, Ms. Booth?

MS. BOOTH: No, Your Honor.

THE COURT: All right. I'll get something out on this shortly.

MS. STAHL: Can I just follow up with a question, Your Honor?

THE COURT: Sure.

MS. STAHL: As far as anything about -- I don't know what the Court will allow in as far as Judith, but my concern is how the evidence comes in if the Government doesn't introduce it or call her as a witness or open the door on that unless the defendant plans on testifying. I just want to make sure that there's not going to be a way to -- there's not a way for them to bring in any allegations against Judith that are not relevant to this case without calling a witness to do that.

THE COURT: All right. Let's talk about that. Let's put a pin in that for one second. Do I have a copy of the forensic interview, the original, the 2017 one?

MS. STAHL: Yes, Your Honor. It's on our exhibit list just because in the event that all of that started to come in, I mean --

THE COURT: That's fine. What number is that?

MS. STAHL: Excuse me?

THE COURT: What number? Because I want to look at it and see how many times she denied how he could -- and I assume, if this little girl testifies, you will get out on direct the denials. Is that right, Counsel?

MS. STAHL: Correct.

THE COURT: Okay.

MS. STAHL: So it's Exhibit 45.

THE COURT: Okay. All right. I'll look at that.

Okay. Judith. So I mean, so, Ms. Booth, it...how do you think you're going to get in all this stuff with Mom? With Judith.

MS. BOOTH: I think, Your Honor, that's part...as per our defense witness list, the defendant's relationship with Judith is well documented by his mother and his sister who live -- he lives with his mom during periods of time. They live in town. They know about the relationship and how that relationship was, Your Honor.

THE COURT: Okay.

MS. BOOTH: I think information about the child -- the children and their mother's going to come

through with the children as well in that they are not the biological children.

THE COURT:  Right.

MS. BOOTH:  So their only tie to Mr. Zamarripa is the fact that he was married to their mother.

THE COURT:  So other family members are going to say the relationship was volatile --

MS. BOOTH:  Correct.

THE COURT:  -- right?  But then who's going to say -- who's going to say she wanted to get him arrested as revenge?

MS. BOOTH:  His mother was in Mexico with him and witnessed that conversation.

THE COURT:  Mom was in Mexico and witnessed the conversation where they broke up.  He broke up with her?  Yeah --

MS. BOOTH:  Correct.

THE COURT:  -- he broke up with her.  And then Mom says or texts -- I wrote it down, but "I'm going to make you pay"?

MS. BOOTH:  To that effect, Your Honor.

THE COURT:  Okay.  How else are you -- any other way you expect to get in that Mom is upset about the breakup and is trying to get him back by having her kids make up this abuse allegation?

MS. BOOTH:  No, Your Honor.

THE COURT:  Okay.  I'm just trying to figure out how the volatility of their relationship is relevant.  I mean, I don't know -- or go ahead, Ms. Stahl.

MS. STAHL:  Your Honor, I would just say that none of this has been noticed, as far as the mom or this "I'm going to make you pay" comment.  And, moreover, it's hearsay unless the defendant testifies.  If the Mom tries to say it, it's hearsay.  If they call Judith, I suppose they could ask her, but we would argue that all of this is irrelevant to the charged conduct because, I mean, the easiest way to bring in this evidence would be to ask the kids if Mr. Zamarripa and their mom had a volatile relationship, and they would say yes, but that's kind of the end of what they can get with that.  They can ask the kids directly, "Were you coached to lie?  Did your mom tell you to do this because she was mad at Othon?"  I mean, there's all of these ways this can come in on cross-examination of the children, but --

THE COURT:  What's the Government's position on the volatility of relationship, whether that's relevant or not?  Is that something you're going to put in your case-in-chief?  Or tell me about that.

MS. STAHL:  I don't believe anyone disputes that the relationship was volatile, but I think it's significant

that they were together for multiple years, and the kids made multiple allegations against the defendant, and the mom defended him in the past, stayed with him when the little girl got herpes, stayed with him when the little boy alleged abuse and was crying and saying, "Why don't you believe me?" All of that and they're still together.  I would note, in the evidence, there's photographs of them all hanging out around Christmas on the 19th, which is after this last incident is alleged to have happened, and then they're still talking on the phone well into the rest of December.  So this allegation -- I mean, yes, things are on and off between them.  I think that was true all the way.

THE COURT:  Do you intend to introduce that there was a volatile relationship between the two adults, Zamarripa and his -- were they married --

MS. STAHL:  No, I don't think it's relevant.

THE COURT:  -- family, okay, his wife?  You don't intend to introduce it?

All right.  Ms. Booth, how is the volatility of the relationship relevant --

MS. BOOTH:  Your Honor --

THE COURT:  -- as opposed to just the threat about the breakup?

MS. BOOTH:  -- if they want to treat this in a vacuum, for eight years in a crowded home, these children

have been abused to the point where they're eating dog feces, getting raped in rooms, being forced to watch pornography, and there's nothing else in this home, then okay.  Then I say yes, then let's do that.

But then I want the Government to be tailored in what they're doing.  And these 404s, this is where I start saying that this is why I think maybe, then, the door gets opened.  Because I think it's fair, then, for defense to say, "And during this whole time, nothing is happening."  The Government is being involved in the homes of these children during this time because of CYFD call-outs, and there are no charges, so...

THE COURT:  Okay.  How is the government involved during the relevant time frame, where there were CYFD reports made about the -- Zamarripa's then wife abusing other kids?

MS. BOOTH:  They're involved because they're coming out to the house.  Not during the time charged period, but we're talking about this 404/412 motion, which they're asking to bring out since the dawn of time, this is how Othon Zamarripa has treated these children.

THE COURT:  They're not.  I don't think they're doing that.  Maybe they were doing that, but they said today they're not going to do that.  They're going to talk -- before the charged period, the only thing they're talking

about is the sexual abuse, not physical abuse.

MS. BOOTH:  Then we would ask the 2017, Your Honor...

THE COURT:  Yes.

MS. BOOTH:  ...and then that we be given -- then that we be allowed, Your Honor, to explore on cross the lack of intervention or any investigation during those time periods.

THE COURT:  Right.  So -- but there was -- so the time periods of the -- that are alleged for the sexual abuse, 2018 to 2022, there were, it looks like, reports made to CYFD about other children being abused.

MS. BOOTH:  Correct.  And those -- those required home visits.  Those required --

THE COURT:  And did they -- is that what happened?  Did the CYFD come out and interview these kids at the time?  So you want to say, "Well, CYFD came out.  Why didn't you say anything?"

MS. BOOTH:  We have limited information, Your Honor, but yes.

THE COURT:  What happened, from the Government?  When CYFD came out for the other couple of calls, did they talk to these children?

MS. STAHL:  Your Honor, I believe they only spoke to the children involved, which would have been Rubin and, I

think, A.Z., which I believe is Alesandra.

THE COURT:  You tell me.  I don't know who these people are.

MS. STAHL:  The youngest.  So the short answer is, no, they didn't speak to either of the minors that are part of this case.

THE COURT:  Okay.

MS. BOOTH:  Then, again, Your Honor...

THE COURT:  Uh-huh.

MS. BOOTH:  ...this is just the concern I have, and I apologize if the argument is confusing...

THE COURT:  No, it's okay.

MS. BOOTH:  ...but they want to open the door to absolutely everything, narrowly tailoring at the things that directly cut against their allegations.  All we are seeking, then, is the ability, Your Honor, that we talk about 2017, which was specifically investigated --

THE COURT:  Right.

MS. BOOTH:  -- and no charges were brought.  Your Honor, and that we be allowed to explore on cross that no charges during this time were called out -- or maybe even the reverse is true, that CYFD -- no other interactions, no reports were found during this charged period.  Maybe that would satisfy being able to make the argument while not opening the door into the Government's issues.

THE COURT:  Okay.  All right.  Let's just talk, then, briefly about the Government's concerns about notice issues with the mom.  I mean, she's on the witness list.

MS. STAHL:  No notice issues as to the statements about "I'm going to make you pay."

THE COURT:  About what?  Say it again.

MS. STAHL:  Not a notice that she wasn't noticed as a witness, she was.  But the notice about all of this happening in Mexico and the "I'm going to make you pay" statement; none of that.

THE COURT:  I'm sorry, I shouldn't use the word "mom" because there are a lot of moms in this case.  I'm talking about the defendant's mother.  I mean, how did you want that to be noticed?

MS. STAHL:  As far as the mom testifying about what happened in Mexico?

THE COURT:  Right.

MS. STAHL:  I'm not sure how it would actually be noticed, Your Honor, I just -- I don't know that -- if there's evidence that they seem to have from a phone that says something to the effect of "I'm going to make you pay," I feel like that should have been disclosed under reciprocal discovery, under Rule, I think, 16.  But as far as, like, what the mom was going to testify to --

THE COURT:  Right.

MS. STAHL: -- I think all we have is the witness list.

THE COURT: Okay.

MS. BOOTH: Your Honor, I misrepresented it. It is a phone call, not a text.

THE COURT: All right. So if it's just a phone -- let me just look -- I'm just looking at Rule 16.

MS. STAHL: And just to clarify, if it was a phone call, was it recorded?

THE COURT: Ms. Booth, are you trying to get in a call or a text or admit any exhibits or information like that, or are you just going to have the defendant's mom get on the stand and say this is what happened?

MS. BOOTH: There will be no physical evidence, Your Honor.

THE COURT: All right. I'm not sure that's a violation of Rule 16. I'm just looking at it to be sure. I mean, I know this is all a moving target, but does the Government have anything on that, that somehow there's a disclosure issue?

MS. STAHL: If it's not recorded, I think that changes the analysis.

THE COURT: Okay.

MS. STAHL: We were just confused about how the statement was coming in.

THE COURT:  That's okay.  All right.

Okay.  I'll get an order out on all the intrinsic evidence, 404, 414.  Then the next motion is Government's motion in limine seeking exclusion of evidence or argument related to the quality of the investigation or prosecutorial decision.  I feel like we may have already covered this.

MS. STAHL:  Yes, Your Honor.  We have kind of dabbled into this.  I would just note that, obviously, if we bring in evidence about the incident when the minor female was three or four, it would be appropriate for defense counsel to ask if she disclosed.  She did not.  I just think we want to make sure we're not getting over into the herpes and we're not getting into any kind of implication that he was cleared.  He just wasn't charged.

THE COURT:  Okay.  All right.  Well, I'll rule on that.  As far as quality of the investigation -- I mean, as far as the investigation of this case, that is what defendants get to do and do, is complain about the investigation, so I mean --

MS. STAHL:  Absolutely, Your Honor.  We just didn't want to be held responsible for why wasn't something done back then when --

THE COURT:  Yeah, no, I understand.  And I see why nothing was done.  I mean, if that's the extent of the evidence, that's hard for any --

MS. STAHL:  Right.

THE COURT:  No one is going to charge that.  And then prosecutorial decisions.  All right.  Do you want to be heard on that, Ms. Booth?

MS. BOOTH:  No, Your Honor.

THE COURT:  So I'll get a ruling out on 95.

Let's talk about the Government's amended notice of expert witness testimony as to Max Weir.  Ms. Booth, do you want to be heard on that?

MS. BOOTH:  I do, Your Honor.

THE COURT:  Go ahead.

MS. BOOTH:  Your Honor, we fear that this is simply to try to circumvent the Court's concerns with the late notice of expert with their Twitter expert.  So we would, frankly, want to know what this amended notice does different than their X expert.

THE COURT:  What is -- tell -- give us the answer to that, Ms. Stahl.

MS. STAHL:  Your Honor -- and I would like the opportunity to address the actual Twitter expert --

THE COURT:  Sure.

MS. STAHL:  -- but specifically to the amendment to Mr. Weir's testimony, Mr. Weir was always going to be the expert for the first two counts and when -- I'll go through the timeline on the other stuff, but when it became apparent

that the defendant was going to -- had hired an expert specific to Count 3, we began the process of trying to find an additional expert.  But Mr. Weir has always been the person we've been relying on for the Twitter stuff.  We were just planning on, if we needed to bring that evidence, getting someone actually from Twitter because it's kind of outside of his normal wheelhouse.  But as is carefully noted in the amended notice, it's not the same testimony we noticed up for our Twitter expert.  It's a lot more general about how he has extracted all of these devices and has reviewed Twitter returns, in that context; how he sees the information stored in the phone; and how, based on his knowledge both as a Twitter user and as an expert interacting with the application through extractions of phones, how that information is stored on a device.  So it's a little more -- in some ways, it's more broad, but it's a little more surface level than what we would seek to get out from a Twitter expert.

THE COURT:  All right.  That's what she wants to do, Ms. Booth.

MS. BOOTH:  Your Honor, I believe that essentially they're just -- because Mr. Weir a user of Twitter, then he is somehow now an expert of Twitter, now known as X.  Your Honor, specifically, in their notice, it says he will testify generally about how the application

curates a personalized feed for the user based on the interaction with the application as well as the unknown algorithms built into the application.  Your Honor, that feels pretty specific.  As far as I know, from Agent Weir's resumé and anything I've of ever had from him in prior testimony, there's nothing to warrant him this specialized knowledge about how Twitter or X, whatever it was at the time, that this picture was supposedly cached, what information he could possibly have about the algorithm being used at the time or how the system was generating that information.

THE COURT:  All right.  Go ahead.

MS. STAHL:  Just to be clear, it's -- that's part of the reason it's phrased, like, generally.  I mean, you can go online and Google "Twitter" and learn how Twitter works generally, but he -- that is very distinct from -- I mean, he doesn't have any information about that algorithm like someone from Twitter would, but he can testify based on his knowledge both as a user and the way that the Twitter records come in to him when extracts devices, about kind of how the account is customized to the user.  So if he dumps one phone and they've searched all car pictures, they're going to have a Twitter feed that's filled with car pictures versus if someone searched for pornography, their Twitter feed is going to be full of pornography.

THE COURT:  All right.

MS. BOOTH:  Again, Your Honor, Google does not an expert make.  So, respectfully, if he Googled how Twitter maintains an algorithm, then that further strengthens our argument that simply his knowledge has never given us any base, there's never been notice, there's never been any idea that he would know about the specifics of an application. He's always been asked how phone dumps work and generally how he pulls information off of phone dumps, and how those files are stored.  That's different than how an application works and its algorithm.

THE COURT:  Okay.  I mean, we're going to have jurors of all ages, but I don't know even know if we need an expert to say that social media curates things for your consumption.  But I mean, who knows, right?

About -- what about the timeliness issue, Ms. Stahl?

MS. STAHL:  So, first of all, I acknowledge it's technically untimely under the standing order.

THE COURT:  Uh-huh, right.

MS. STAHL:  This case has been going for two and a half years.  It's been designated complex almost from the beginning.  We've had various scheduling orders that we've been operating off, but the most recent one from October of 2024.  So I just kind of want to go through quickly the

timeline.  When the trial was set in April, we timely disclosed our expert, Max Weir, in February.  But we didn't unlock the phone and discover the images until the end of March.  We promptly let defense know.  They promptly filed a motion to continue the trial, and we did not oppose that.  It was reset for July.  And the Court's order from April specifically extended pretrial deadlines related to the new charge and the new discovery.

So we superseded the Indictment on 4-16.  And so pursuant to the standing order, our expert disclosure would have been due on May 16th, but the first indication we had that defendant had obtained a forensic expert specifically was on May 30th, which was well past our deadline.  So we did note for the Court at the hearing on June 10th that we did intend to seek a rebuttal expert based on the defense's new expert; that was specifically someone from Twitter.

THE COURT:  Right.

MS. STAHL:  So immediately after that hearing, on June 11th, we began reaching out to X Corp. to identify an expert.  We didn't get a response until June 24th.  We were originally given a name, and then that person was leaving the company so they had to find another engineer.  And then based on the Court's order on June 20th extending the defense deadlines to 6-23 and the Government's responses to 7-3, that was kind of what I was thinking of as our new

deadline for disclosing things.  We received a name and a LinkedIn profile on July 2nd and filed our notice the same day.

So I understand, under the standing order, that this was certainly untimely.  I think, given the kind of confusion around deadlines and the whole procedure of this case, there's good cause.  And I recognize the Court has broad discretion to impose sanctions for these kind of discovery violations, but I know the Court is aware of the factors that are kind of considered reasons the delay happened, including whether or not the Government acted in bad faith, the extent of the prejudice, and the feasibility of curing with a continuance.  And, obviously, these are just a guide, but when sanctions are imposed, it should be the least severe sanction that will accomplish compliance with the discovery orders.

So, here, I think it's clear there was absolutely no bad faith.  First of all, I think it's the first deadline the Government has missed.  After numerous extensions, other missed deadlines by prior counsel, changes in counsel, new changes to deadlines, we amended the Indictment multiple times, there were multiple scheduling orders, all of those things were so much so that defense actually requested a hearing to clarify trial deadlines.  And so I think there was -- there's good cause to show why this could have

happened and it wasn't in bad faith.

And then, you know, I correctly -- I incorrectly assumed that by giving notice at the hearing that we were seeking an expert that we had provided some sort of notice. But then the defense didn't end up noticing up their expert, and we're kind of stuck with an untimely notice to that in that regard. But I think that it's clear from the record there was nothing untoward or in bad faith about this.

And as to the prejudice, despite the fact that we've had the forensic expert, Max Weir, in place since February, defense counsel had never retained an expert. And as soon as they noticed that they had one, we made discovery available to that expert. We went to great lengths to get that to him in a way that was convenient to him. So I think their strategic decision not notice him up should not now preclude us from still having an expert on those charges. We gave 21 days' notice and certainly wouldn't oppose an untimely disclosure if they want to now notice up their expert.

THE COURT: What's going on with your expert, Ms. Booth?

MS. BOOTH: Your Honor, part of the issue with our expert is that we sent the information. The analysis that he did was curated and tailored to the charges that we had and what we knew of the allegations at the time.

THE COURT:  Right.

MS. BOOTH:  So this is a concern that's not in this report, but it's important for the Court to know.

THE COURT:  Sure.

MS. BOOTH:  We did not believe it was necessary to put an expert on.  We could use our expert for the purpose of cross of Max Weir.  So, inevitably, he just became --

THE COURT:  A consultant.

MS. BOOTH:  Correct, Your Honor, a consult.

THE COURT:  Yeah.

MS. BOOTH:  And so we didn't feel it was necessary to notice.

The concern I have now is he has since shipped back that information to here, because there's a process in which the stuff has to go through.  So he no longer has the discovery.  This goes to what Mr. Benjamin was making the argument earlier as to the information.  One of the issues I have, Your Honor, is that I don't necessarily -- truly, for the purpose of this amend -- this expert, I don't have any issues with this X Corp. person coming in.  I believe we're a little bit shy of what it is that this person plans on testifying to, so we anticipate getting something from this expert that would give us that kind of baseline.  We would absolutely oppose Mr. Weir being used in any shape or form

to explain anything about X Corp. and how that application works. I think if we knew --

THE COURT: About Twitter?

MS. BOOTH: Twitter.

THE COURT: Not about extracting the phone, but ultimate to his expert testimony on Twitter?

MS. BOOTH: Correct, correct. I think, given our lack of knowing who this witness is, we would ask for a report from him on what he plans on testifying as to this. We don't know if he plans on being a blind witness or if he's going to speak specifically as to these images and whether or not they're --

THE COURT: Is he going to be a blind witness or testify as to these images?

MS. STAHL: He's not a blind witness. He is aware of what Twitter had about this account.

THE COURT: All right. Just kind finding out. Go ahead.

MS. BOOTH: We need information, Your Honor. I don't know what else to say. I appreciate the Government's concern that we've had this phone dump, but it is a massive amount of information that's on a phone. We weren't able to even get it to our expert until we -- you know, had to ask the Court for deadlines in order to send that out. So our expert had to turn around a report in a very short period of

time.  Everything that the Government represented about this other Twitter profile and all of that stuff, while it may not have been part of the protective search, Your Honor, we had no way of knowing that this was something that they intended on using.  And, again, it should have been noticed as 404, but we need to know what they intend to do with this expert on X because, as far as I'm concerned, all I know is he has every intention of telling us how a cache works and how a feed works.  And now we know that he's going to speak specifically about this case.

THE COURT:  So he's going to -- is it right that Weir is going to say -- Ms. Stahl, is it right that he's going to say -- testify, "These are the images we found from Twitter that were cached on the phone when we did the phone dump," and he's going to be the one that links this false account to the defendant?  I shouldn't say "false," but just an account that's not linked to him otherwise, to the defendant?

MS. STAHL:  Yes, Mr. Weir will testify about all of the data that's on the phone that ties to Mr. Zamarripa.  The case agent will also testify as far as her investigation in, like, subpoenaing this record and it ties back to this phone number.  So she also kind of pieces together that account.

THE COURT:  Okay.  And what was put in the

original expert notice for Mr. Weir?  Or Agent Weir, whatever he is.

MS. STAHL:  Originally, the expert notice summarized about 12 things, and they're all related to forensic examination and the tools that will are used in that process, like Cellebrite or AXIOM.

THE COURT:  Right.

MS. STAHL:  His knowledge of interstate and foreign commerce nexus with cellular telephones and internet.

THE COURT:  Okay.

MS. STAHL:  How he extracted the devices in this case; his general knowledge about metadata which gives information about other data.  And, technically, the cache data is metadata.

THE COURT:  Right.

MS. STAHL:  And then his knowledge of metadata from search engines utilized to view the pornography in this case; file locations, which is kind of relevant to the Twitter cache.

THE COURT:  What was the thing you said right before file locations about pornography?

MS. STAHL:  Oh, metadata from search engines that was utilized to view pornography; importance of device logs about determining where original activity is deleted.  And

that's kind of the end of the original notice.

THE COURT:  Okay.  I mean, that's sort of like what he always testifies to.

MS. STAHL:  Correct.

THE COURT:  And so the only change you want now is how Twitter curates its feeds by users for searches.  And then you want him to just give information that your case agent used to tie the Twitter account back to the defendant, or you want him to actually give information on how he tied the Twitter account back to the defendant?

MS. STAHL:  He will only give information on what data from the Twitter account was stored on the phone, and the case agent will piece it together.

THE COURT:  Tie it all together?  Okay.

All right.  Ms. Booth?

MS. BOOTH:  Again, we would -- we need more information as to what the X/Twitter expert would want to tell us.  If he's not a blind expert, then what is he going to tell us about this case specifically?  And then we would ask -- then we can object at that time.  At this point, we believe that the notice, although untimely, is also insufficient to tell us what we were planning on hearing from this expert.

THE COURT:  All right.  Well, I'll rule on this -- I mean, for now, Ms. Stahl, get out a notice.  It

doesn't have to be, like, the full notice again, but about the additional opinions Mr. Weir wants to give about, you know, his basis for the opinion as a user -- I'll just tell you if his basis is stuff that he Googled, that is probably going to be a problem with the Government -- but, like, his source of expertise and what he would testify to at trial.

MS. STAHL:  Okay.

THE COURT:  All right.  Get that out, like, what's -- it's Tuesday.  Get that out by close of business tomorrow.

MS. STAHL:  Okay.

THE COURT:  I mean, I don't know if I'm going to let it in anyways, but I want to get it out so the defense has as much notice as humanly possibly.

Ms. Booth?

MS. BOOTH:  Your Honor, we would ask the same for Remy, the Twitter/X expert.

THE COURT:  Okay.

MS. BOOTH:  And I wish they didn't change their name.

THE COURT:  With the same deadline?

MS. BOOTH:  Yes, Your Honor.

THE COURT:  Is that what you're saying?

MS. BOOTH:  What we've been noticed is, in my opinion, appears to be a blind expert, an expert as to the

Twitter universe and how that experience would work for any user --

THE COURT:  All right.

MS. BOOTH:  -- as opposed to specifically his knowledge of the case.

THE COURT:  All right.  Let's move on, then, since we're talking about it, to the next expert, the Twitter expert.  How do you say your expert's last name?  Bourgoin?

MS. STAHL:  It's French, and you've got closer than I would have.

THE COURT:  All right.

MS. STAHL:  I'm going to have to learn.

THE COURT:  Remy.

MS. STAHL:  I haven't gotten good at it.

THE COURT:  Is that a blind expert?

MS. STAHL:  Your Honor, he's not a blind expert in the sense that he can go in and look at the data specific to this account that we are talking about and the images that were cached.  And I can -- but he is akin to a blind expert in that part of the reason we would like him to testify is to educate jurors.  I mean, if you get -- I don't use Twitter.  I don't really understand how it works.  And I consider myself fairly savvy.  But if you get a wide swath of people and some might be older, I just think

understanding kind of how it works is helpful to the jury. And then because the knowledge -- the intent-to-view aspect is going to be critical in this case, having an understanding of how users interact with the app and how those -- I don't think he can testify about, like, proprietary information about the algorithms, but he can testify generally how feeds are -- for lack of a better word, how they're assembled and how that is based on interaction with other stuff, and also how the cached images are created generally.

THE COURT: So that's all general. What do you want him to testify specifically as to any of the information in this case?

MS. STAHL: I don't anticipate that he will testify specifically to any of the information in this case. But he is aware of the account and can look at it, so I didn't want to represent that he's a blind expert, because he's familiar with the account and the images and where they were cashed.

THE COURT: Okay. I guess that's fair. So he's not blind because he's seen some of the case file, but he will not testify about anything specific in this case?

MS. STAHL: He is not going to give opinion testimony about whether the defendant clicked on these particular images or anything like that.

THE COURT:  Are you going to show him the exhibits or talk to him about the facts of this case, or are you just going to ask, "What are your qualifications and how does Twitter work"?

MS. STAHL:  Can I have just a minute?

THE COURT:  Sure.

(Discussion off the record.)

MS. STAHL:  Your Honor, my only hesitation in not agreeing is just if he has access and has viewed the defendant's specific Twitter account and he wants to speak on how it was curated based on the other searches, I'm a little concerned that I'm tying his hands.

THE COURT:  I mean, experts' hands are tied based on disclosure problems, but okay.

Show me, what exhibits are the ones that are cached from the Twitter.  Which exhibits are they?

MS. STAHL:  They are at the six CP exhibits and they are numbered 70 through 76 -- 75.

THE COURT:  Oh.  Seventy through 75?

MS. STAHL:  And we brought physical copies --

THE COURT:  Let me see them.

MS. STAHL:  -- for the Court.

THE COURT:  Have you seen these, Ms. Booth?

MS. BOOTH:  I assume they're the same ones that we saw.

THE COURT:  All right.  If you want to come look at the ones I'm looking at, you're welcome to.

MS. BOOTH:  May I approach?

THE COURT:  Yeah.

Y'all can come up too.

So 70 through 75 are cached images from Twitter. And the allegation is the defendant interacted with these potentially just by scrolling through them, not clicking on them?

MS. STAHL:  Potentially.

THE COURT:  Okay.  And, sorry, Ms. Booth you can --

(Discussion off the record.)

THE COURT:  All right.  You can have these back, Ms. Stahl.  Well, I'm going to let my clerk have a look at them for a second, so she can have a basic idea.

Okay.  Get a report out on both of them by close of business tomorrow.  I'm not saying I'm going to let them in based on timeliness issues, but get a report out to Ms. Booth so she can look at it and she can call her expert back if she wants to.

And then, I guess, Ms. Booth, do you even know if your expert has -- your consulting expert has any information about Twitter and how it works?

MS. BOOTH:  Your Honor, he has given me

information.  He has helped me with a lot of the language. If I would have the same concerns if he were an expert as Agent Weir?  I don't specifically know because I did not anticipate presenting him in that capacity.  So I'm not comfortable representing that to the Court.

THE COURT:  That's fine.  We'll get those out to you.

Send a copy to me, too --

MS. STAHL:  Yes, Your Honor.

THE COURT:  -- by close of business Wednesday. And then I'll make a decision on it.  I am concerned about the timeliness issues, though.

Okay.  Ms. Booth, what's going on with Dr. Cave at this point?

MS. BOOTH:  Your Honor, we're not going to seek to introduce her testimony.

THE COURT:  All right.  Then let's talk about...

MS. BOOTH:  And, Your Honor, to make a more complete record, we are using her, again, like a consulting expert; however, the -- and that is not seeking any remedy, it's just to make a record -- the nature of the timeliness of it all and trying to cure it became insurmountable with her schedule, and we are choosing to proceed forward in this manner.

THE COURT:  You want to have a trial on the

scheduled dates regardless?

MS. BOOTH:  Yes, Your Honor.

THE COURT:  You don't want a continuance to fix this problem?

MS. BOOTH:  No, Your Honor.

THE COURT:  All right.  Thank you.

Okay.  Let's talk about the Government's objection to defendant's witnesses.  Judith Gonzalez.

Go ahead, Counsel.

MS. STAHL:  Your Honor, give me just one second.

THE COURT:  Sure.  It's 116.

MS. STAHL:  Oh, thank you.  I had it earlier. The biggest thing is that her testimony is -- well, I should say one of the things is it's irrelevant.  But the bigger thing is the reason that they would be calling -- the reason defense would be calling her is to basically impeach her and kind of make her the bad guy in this case.  And there's just not a good-faith basis for doing that.

THE COURT:  What's your plan on Judith Gonzalez, Ms. Booth?  And you guys can just stay at the table if you want.

MS. BOOTH:  It's hard to argue, Your Honor, with everything down (indicating) when searching.

THE COURT:  That's fine.

MS. BOOTH:  Your Honor, under those

circumstances, at this point, we would be fine, Your Honor, with asking the Court to reserve ruling to see if trial warrants the door being opened into the relationship between Othon and Judith.

THE COURT:  So the reason that you would want to call Judith Gonzalez would be to talk about the volatile relationship?

MS. BOOTH:  Correct, Your Honor, and --

THE COURT:  Any other reason why?

MS. BOOTH:  Your Honor, I believe there is a possibility that the timeline in which the children state that Judith was working, and that's why she was out of the house, is fundamentally not true; that she didn't -- she was not working outside of the home at those times.

THE COURT:  Okay.

MS. BOOTH:  So specifically to rebut those.  If we find that necessary, we will notice the Government and let them know, but it's not just to the volatility of the relationship, it goes to the credibility of the two children.

THE COURT:  All right.  Anything else?

MS. BOOTH:  No, Your Honor.

THE COURT:  All right.  So given that explanation from the defense about why they would call Judith Gonzalez, what's Government's position?

MS. STAHL:  I still think the kids are the best evidence.  They can certainly explore both of those issues on cross-examination of the children.  And it goes to their credibility is kind of the purpose of introducing that evidence, so I don't know that it's relevant to come through Judith, but, I mean, it certainly could be explored on cross.

THE COURT:  All right.  So, I mean -- and the Government's position continues to be that the volatility of the relationship between Judith Gonzalez and the defendant is not relevant?

MS. STAHL:  No.  Because I think you would have to have another leap from, yes, there was a volatile relationship, but they were together when other allegations were made, and --

THE COURT:  Okay.

MS. STAHL:  -- she stuck by him.  So, like, these allegations can't just crop up once they started having trouble in 2022.  These allegations had been kind of festering, and she had stood by him.

THE COURT:  All right.  Okay.  And the defendant's position on the -- just the volatility of the relationship is what, just so I understand?

MS. BOOTH:  Your Honor, that she had sole custody and control of these children and that during that time,

given her experience and work knowledge with CYFD, that she curated the stories that the Court is seeing here today in order to get back at him. Which seems extreme unless you knew the history of their relationship.

THE COURT: All right. I'll -- let me think about the volatility of the relationship and see what comes out at trial. I mean, but I can't imagine a situation where if a kid says something happened on one day and the mom wasn't there and the mom said, "I was there at the time," I wouldn't let that in. So the Government should just be prepared for that to come in. I guess I'll see what happens at trial, but it seems like that comes in.

Then Margarita Zamarripa, the defendant's mother. You know what she's going to testify to now. Ms. Booth, the Government's also concerned that she'll bring in some kind of character evidence. I mean, you know, your client can put his character at issue if he wants to, but what do you think about Margarita, besides the phone call in Mexico?

MS. BOOTH: Your Honor, they go specifically -- if we want to talk about a specific incident, but they were all present during the life of these children. And the abuse allegations that the Government seeks to -- not just the charged allegations but all of their grooming evidence that they want to put in, Your Honor, these witnesses go specifically to refute what these children are now saying

were these things that were happening to them inside of the home. So they go specifically to rebut the evidence that the Government seeks to meet through all of their exhibits. The more specific one -- my apologies, Your Honor -- is to the December incident where this, I believe, happens at the home of his mother. And she will say that she was already home when the two children came into the house, Your Honor. And so she can specifically rebut the allegation that's being made on that night of this party that happens after the Desert Hills school event.

THE COURT: All right. So Mom does not -- defendant's mom does not live with the defendant and his children?

MS. BOOTH: She did, Your Honor. They lived at Mother's home.

THE COURT: Everybody's living at Mom's house?

MS. BOOTH: Correct.

THE COURT: Okay. And so the mom would say that the children -- well, I don't know if she could really say they weren't groomed, but she would say that the children were not physically abused.

MS. BOOTH: She could say, Your Honor, that she never saw injuries that were consistent with that. She could say that, you know, living in the home full-time, you know, never saw any of the abuse allegations, especially to

John Doe.  I mean, the amount of abuse that's alleged there is significant, so to say that the person -- the people living in the home, including at some point, I believe, the sister lived there at some point.  I know she frequents the home, if not his mother living there, did not see any of this, I believe is important and goes to rebut their story.

THE COURT:  So the mom's going to say, "I didn't see any injuries consistent with the" -- you know, "these kind of very severe allegations of abuse"?  The mom is going to say, "I never saw any abuse."  And what about the other grooming of the little girl?

MS. BOOTH:  Same, Your Honor.

THE COURT:  But she alleges abuse -- grooming by, you know, the other way, like, rewards and gifts and --

MS. BOOTH:  I guess, more specifically to the daughter, Your Honor, is that they allege that he somehow gave her special and individualized treatment --

THE COURT:  Right.

MS. BOOTH:  -- than the other children, and she would say, no, that all of the children, whether or not they were biologically his children or whatever, the story was he treated them the same.

THE COURT:  Okay.  Okay.  So -- so Mom is going to say -- about the phone call -- Mom is going to say that the kids were not groomed or abused.  The mom is going to --

tell me about the December incident, that -- about a party.

MS. BOOTH:  Correct, Your Honor.  The argument over the Desert Hills situation, Your Honor, is -- part of it is that the children say that he brought them home.  I don't want to misrepresent what the kids say because I don't have a perfect memory, Your Honor --

THE COURT:  That's all right.

MS. BOOTH:  -- but that a sexual assault happens at the time.  There is a party that actually -- or there is a bunch of people that come over to the home, and there's an entire Christmas kind of party that happens on that day in the home.

THE COURT:  Okay.

MS. BOOTH:  Mother will say she was home and present during all of this and she was home when the children came home.

THE COURT:  And the kids say the grandma wasn't home?

MS. BOOTH:  Correct.

THE COURT:  Okay.  Did Grandma work --

MS. BOOTH:  Your Honor, I --

THE COURT:  -- Margarita Zamarripa, or was she home all the time?

MS. BOOTH:  -- I don't know.

THE DEFENDANT:  She works.

MS. BOOTH:  She works, Your Honor.

THE COURT:  Okay.  Okay.  All right.

Sorry.  While they're talking, if she wants to bring in proper character evidence, that's fine, but do you anticipate her bringing in character evidence?

MS. BOOTH:  Not at this time.

THE COURT:  All right.

MS. STAHL:  Your Honor, just -- it sounds like 404(b) evidence as far as this call, if there's not, like, a record of it.  I understand we earlier had said that we didn't receive any notice.  If it's going to be -- maybe it doesn't fit 404(b), but it's a specific instance they want to testify that is basically putting words in Judith's mouth, so it's hearsay at any level for the mom to talk about something that Judith told the defendant or even anything that the defendant told his mom because, you know, defendant's out-of-court statements can't be offered unless he testifies.

As far as the defendant incident -- excuse me, the December incident, my understanding is that the kids will testify that when they first arrived at the residence, she was not there, and then she arrived with the other kids at some later point.  So to the extent that there's a factual discrepancy there, I think she could testify about what she remembers about that incident, and the jury could

weigh the credibility.  I don't think she can testify that she never -- like, she can't say that they weren't abused. She could testify that she didn't see abuse, but to make any kind of inference --

THE COURT:  I think that's what Ms. Booth said.

Isn't that right, Ms. Booth?

MS. BOOTH:  Yes, Your Honor.

THE COURT:  All right.  Yeah, that's what she said.

MS. STAHL:  And we would just note that if that is the testimony, then we would be able to rebut with the specific allegations -- we would able to cross her on the specific allegations under -- give me just one second -- that's part of what I noticed in my omnibus motion. Basically, if they're going to bring in evidence that he -- basically good character -- he was a good dad; this didn't really happen -- we should be able to cross on specific acts of conduct that are alleged in this case.

THE COURT:  Yeah.  I mean, it looks like the defense right now isn't anticipating bringing the defendant's character into evidence through this witness. Is that true of all witnesses, Ms. Booth?  You're not anticipating that right now?

MS. BOOTH:  That's correct, Your Honor.  We don't believe that the state's case-in-chief warrants that.

THE COURT:  All right.  So if no character evidence comes in, we're not going to worry about it.  So if it comes in or you think it comes in, come talk to me and we'll figure it out.

As far as the phone call itself -- so, Ms. Booth, the witness is going to say what?  She's in Mexico -- when is the trip to Mexico?

MS. BOOTH:  Your Honor, may I have a moment --

THE COURT:  Sure.

MS. BOOTH:  -- to get complete facts of the situation, Your Honor?  I'm sorry, I wasn't prepared to argue that.

THE COURT:  That's all right.  Go ahead.  That's okay.  That's all right.  Go ahead.

(Discussion off the record.)

MS. BOOTH:  Your Honor, would the Court entertain a five to ten-minute recess for me to just --

THE COURT:  Sure.  All right.  Yeah, we're going to be on a ten-minute recess.

(A recess was taken.)

(Whereupon Mr. Benjamin reentered the courtroom.)

THE COURT:  All right.  Ms. Booth, what do we have?

MS. BOOTH:  Your Honor, at this time, we would stand by the reason for calling Mother is specifically as to

the December 16th allegation and to any prior interaction that she's had with these children and not saying in this case anything that substantiates the 412, 404(b) notification.

THE COURT:  What's Mom going to say happened on the call?  The call comes in, it's on speaker phone, it's a single-person call?  What's she going to say about the phone call?

MS. BOOTH:  Your Honor, we won't seek that testimony from her.

THE COURT:  Oh, sorry, so you're not -- oh, I thought the December incident was the phone call.  What's the December incident?

MS. BOOTH:  Sorry, Your Honor.

THE COURT:  The party?

MS. BOOTH:  Correct.  He does go to Mexico in December, so I unintentionally confused the Court.

THE COURT:  That's all right.  It's a confusing case.  All right.  So we're no longer doing the call at all?

MS. BOOTH:  As of right now, no, Your Honor.  If the door opens, we will approach and ask the Court before we seek any information about that.

THE COURT:  Sounds good.

From the Government?

MS. STAHL:  That's fair, Your Honor.

THE COURT:  All right.  That's what we'll do, then.

All right.  Then we have Othon Zamarripa.  What's he going to testify to?

MS. BOOTH:  Yes, Your Honor, that is his child, his son, Ruben.  Ruben will testify as to also being present, being present through numerous different times around the two children, and also goes directly to rebut the 412, 404.

THE COURT:  All right.  And Estella, same thing?

MS. BOOTH:  Same, Your Honor.  She was present at that particular party, but also was present at different times than the other two, and also does not substantiate the 404 and 412.

THE COURT:  So didn't see bruises.  Both of them say they didn't see bruises and never saw physical abuse and never saw any of the grooming behavior?

MS. BOOTH:  Correct.

THE COURT:  Anything else?

MS. BOOTH:  No, Your Honor.

THE COURT:  All right.  Then we have the Government's exhibit.  We dealt with the foundational issue on that.  There is a foundation for authenticity for Exhibit 41.  The Government will have to call that witness live to testify in trial.

Then we have the Defendant's exhibit list with some objections to Defendant's Exhibits 4 through 14, and 16 through 18.

MS. STAHL:  And --

THE COURT:  Go ahead.

MS. STAHL:  I would just ask for clarification. We filed anticipated objections based on what we thought was going to be the exhibit list.  I don't know if those are still the exhibits for current counsel.

THE COURT:  Ms. Booth?  I think prior counsel is the person that submitted this exhibit list.  And so if you still want to do Exhibits 4 through 14 and 16 through 18, we can do the foundation on that now or we can just not worry about it if any of that has changed.  Yeah, go ahead and take a look at it.

MS. BOOTH:  Thank you, Your Honor.  It's just not loading right now.

THE COURT:  No, that's fine.

MS. BOOTH:  Your Honor, while I was searching for the exhibit list, I did not listen to the Court's specific question.

THE COURT:  That's all right.  The Government has lodged exhibits [sic] to 4 through 14, foundational exhibits [sic], and 16 through 18.  And -- but they wanted to check and see if we needed to go ahead and do the foundations

today or whether you weren't even going to use these exhibits anymore.  We just didn't know since prior counsel filed it.

MS. BOOTH:  Your Honor, we would be going forward on especially the videos being taken from the date in question, December 16th.

THE COURT:  What numbers are those?

MS. BOOTH:  Those are going to be 6, 7, and 8.

THE COURT:  Uh-huh.

(Discussion off the record.)

MS. BOOTH:  And the photographs as well.  So those were the videos 6, 7, and 8.  The photographs are 4 and 5.  We would seek their admission as well, Your Honor.

THE COURT:  Okay.  What about 9, 10, 11, 12, 13, and 14?

MS. BOOTH:  I think, given the course of today, Your Honor, 9 is in relation to Judith, Your Honor, but the child is not one of the charged children.  I think the Court does not intend to allow anything in involving the other children, so I don't believe we would be seeking 9.

THE COURT:  All right.  What about 10?

MS. BOOTH:  At this time, Your Honor, we would still seek 10.

THE COURT:  What about 11?

MS. BOOTH:  Your Honor, if character comes into

question, 11 would be placed in.

THE COURT:  What about 12?

MS. BOOTH:  The same would be true for 12, Your Honor.

THE COURT:  Okay.  And what about 13?

MS. BOOTH:  Your Honor, again, it's an -- that's one of the addresses, I believe, where they allege some of the attacks.  And we believe the floor plan would, then, be relevant as to that.  I think the children --

THE COURT:  All right.  What about 14?

MS. BOOTH:  The same, Your Honor.

THE COURT:  All right.  What about 16 through 18?

MS. BOOTH:  Your Honor, I would need to specifically look at 16 at this time.  We would seek its admission.  I cannot represent to the Court why specifically that was requested.

THE COURT:  Okay.  What about 17 and 18?

MS. BOOTH:  Your Honor, if it becomes relevant, that goes into further detail, again, about the volatility and the allegations in this case.  I think, if something becomes relevant for impeachment purposes, 17 would play in, but as it's laid out right now, Your Honor, I don't believe it would be in any of the state's [sic] case-in-chief.

THE COURT:  Say that again.  I'm sorry.

MS. BOOTH:  There are statements and allegations

made in 17 that could go for rebuttal purposes, statements made through counsel by Judith, but, Your Honor, given -- I don't believe that it's going to come into play. It definitely will not be sought unless being used for rebuttal purposes -- or impeachment purposes. Let me be more specific.

THE COURT: Okay. Impeachment. Okay.

All right. So the Government has lodged foundational exhibits [sic], so we're going to do foundation now, then, as to these.

MS. BOOTH: Your Honor, the videos and pictures, we can lay through witnesses. We are not prepared to do that today, Your Honor, but can be.

THE COURT: Where are these witnesses?

MS. BOOTH: Around in Doña Ana County, Your Honor. I don't know where they specifically are at this moment.

THE COURT: No, no, they're local witnesses?

MS. BOOTH: Correct, Your Honor. They're videos taken by family and people at the event.

THE COURT: Okay. So the video -- okay. So the...video and photographs, so Exhibits 4 through 8, are taken by local people from -- people who are available or, like, would have been available, if they had been subpoenaed. Were they subpoenaed?

MS. BOOTH:  Yes, Your Honor.

THE COURT:  They were subpoenaed?

MS. BOOTH:  Your Honor, they were supposed to have been subpoenaed or notified with prior counsel.

THE COURT:  For this hearing?

MS. BOOTH:  No, Your Honor.

THE COURT:  Okay.  Just subpoenaed for trial?

MS. BOOTH:  Correct.

THE COURT:  What about for this hearing?

MS. BOOTH:  No, Your Honor.

THE COURT:  Okay.  Do you want to give me some reason?

MS. BOOTH:  Your Honor, I just had not anticipated laying foundational issues for those today with those objections.

THE COURT:  Okay.

MS. BOOTH:  I came with what we have discussed so far, and I was not prepared to lay a foundation for that.

THE COURT:  All right.  What about, then, Exhibit -- well, let me just ask for the remaining exhibits for which foundational objections were lodged, what did you do to bring in those witnesses?

MS. BOOTH:  Your Honor, I truly -- 16, 17 -- 16 and 17 specifically, Your Honor, I don't -- I don't anticipate and do not lay a foundation for those.  I don't

anticipate those coming in.

THE COURT:  Okay.  What about the rest?  So 10 -- well, all the rest for which foundational objections were lodged?

MS. BOOTH:  Ten we would argue --

(Discussion off the record.)

MS. BOOTH:  Yes, Your Honor, if Ms. Judith Zamarripa testifies, Your Honor, then we believe that this would be relevant to impeach her.  Ochoa-Zamarripa is the same as Judith, just so that we're clear in the record.  The last name has changed because they got divorced, not for anything malicious, but Judith Zamarripa is now Judith Ochoa.

THE COURT:  Okay.  Lovely.  What about foundational witnesses for all of these?

MS. BOOTH:  Your Honor, I don't believe we would need one for 10 because it would be used, like I said, for impeachment, if Judith were to testify, as to her credibility.

THE COURT:  All right.  So this would be impeachment only?

MS. BOOTH:  Eleven would come in, Your Honor, if my client chooses to testify.  Then that's how the foundation would be laid, Your Honor.

THE COURT:  All right.  Well, this is a

Department of the Army certificate and a Department of the Army honorable discharge?  I don't know, how would your client be able to lay a foundation for those things?

MS. BOOTH:  Your Honor, it's how -- his personal knowledge of how he was discharged from the Army, which we would say would go to his credibility, which, if he testified, would then be allowed in.

THE COURT:  I guess we can cross that bridge when we come to it, but I'm not sure he is the correct person to lay the foundation for those documents, but, you know, we can try.  Don't bring them up in opening.

MS. BOOTH:  Okay, Your Honor.

THE COURT:  What about the rest of the exhibits as far as -- so 13 through 15 and, I guess, 18?

MS. BOOTH:  Your Honor, 13, 14, 15, we believe the children, they state that they have familiarity as part of the state's exhibits themselves.  They seek admission of those pictures.

THE COURT:  Does the Government want these pictures in, 13, 14, and 15?

MS. STAHL:  No, Your Honor, we --

THE COURT:  Okay.

MS. STAHL:  -- disclosed our pictures.

THE COURT:  These are different than your pictures?

(Discussion off the record.)

MS. STAHL:  Yes, I believe so.

THE COURT:  All right.

MS. STAHL:  I know the floor plan is not ours. And the videos -- I believe the pictures and the videos were taken by their investigator.

THE COURT:  All right.

(Discussion off the record.)

MS. BOOTH:  So Javier Diaz is not your investigator, for the Government?

MS. STAHL:  No, Your Honor.

THE COURT:  Is Javier Diaz your investigator?

MS. BOOTH:  Yes, Your Honor.  He's our PI, but we don't want -- plan on calling him.  Your Honor, I think if in the course of testimony it becomes relevant, we will not seek to admit these through the children unless we approach, Your Honor.  But I don't believe that we're going to use them in our cross at this time, Your Honor.

THE COURT:  All right.  Okay.  So -- but your investigator, like, isn't a local investigator?

MS. BOOTH:  He, is Your Honor.  He's here in Doña Ana County.

THE COURT:  Did you subpoena him for this hearing or ask him to come?  Did he say he was going to be here but he didn't make it?

MS. BOOTH: No, Your Honor. And, again, I don't believe that we will be seeking the admission of these.

THE COURT: All right.

MS. BOOTH: Unless for some reason it's an impeachment or something. And I just don't anticipate that, Your Honor, so we would withdraw -- the only ones that we would seek to still have the Court hear are the photographs and the videos that were taken, Your Honor. I know those witnesses were not subpoenaed to be here today.

THE COURT: Why not?

MS. BOOTH: Failure by myself, Your Honor.

THE COURT: All right. That's fine.

Who is Jorge Angulo, who I guess surveyed the residence for Exhibit 13?

MS. BOOTH: Your Honor, that was somebody hired by previous counsel. I never met him and do not know.

THE COURT: Okay.

MR. BENJAMIN: Your Honor, to answer the Court's question, he's my neighbor. I didn't use him but he's Jorge Angelo and he lives in El Paso, Texas.

THE COURT: Okay. All right. Then I guess I'll rule on these -- I'll get out a ruling on the failure to lay a foundation at the pretrial conference. We will get that out.

Anybody want to be heard on anything more about

the failure to lay a foundation?  From the Government?

MS. STAHL:  Nothing beyond what the Court has already noted.

THE COURT:  From defense?

MS. BOOTH:  No, Your Honor.

THE COURT:  Let's talk about the special jury questionnaires.  We anticipate receiving those about a week before trial, so on the 16th.  I want you-all to meet and confer and provide me a list of jurors that you agree should be excluded based solely on the special jury questionnaires by Monday, so that's July 21st, at noon.  So in the morning, so I can start looking at them.  You can just email that list to Ms. Chavez.  Actually, I should say a list of jurors you agree should be excluded based on the special jury questionnaires or the standard or whatever it's called. If somebody writes something in that standard questionnaire that somehow we think has cause -- because we're pulling in a big panel, I want to -- I don't want people to have to come in that we're going to bump for cause.  So that will just make voir dire go faster for everybody.

Also send me a list of people that you want to do individual questioning of based on any answers to the special jury questionnaires.  So, basically, what I'll probably allow individual questioning on is people who disclose they or someone close to them has been a victim of

sexual assault or been accused of it.  So we'll talk to them in the jury room and we'll just get rid of them.  And then we'll do general -- you guys have done this with me before -- we'll do general questioning.

MR. BENJAMIN:  We did this exact thing in a previous trial.  I liked the Court's approach there.

THE COURT:  Yeah, it's like deja vu talking to you about it, but that's what we're going to do again.

MS. BOOTH:  Seven-sixteen was the release date, Your Honor, or did the Court ask us to meet on this date?

THE COURT:  No, that's when we think we'll get them.  Some might trickle in later because that's how life is.  I don't have a date by which you should meet and confer.  I can give you-all one if you want one, but I want the list of who the parties agree should be excluded and who the parties want to individually question by Monday, July 21st, at noon.  And I know noon is a weird deadline to give, so I'm sorry, but I need to start looking at them too.

MR. BENJAMIN:  Understood.

THE COURT:  Do you-all want a date by which you all want to meet and confer?

MR. BENJAMIN:  No, Your Honor.  Just asking.

THE COURT:  Sounds good.  The Government gave proposed voir dire; that's fine.  As the parties both know,

I will do a very short voir dire on my own that basically talks about scheduling conflicts or other hardships and then I will ask a very sort of general question about whether they can sit on a jury for a case like this. But otherwise, I don't like doing voir dire because I used to hate the way judges did it for me and I don't know the facts of the case as well as you-all do, so I don't want to mess up your guys' plans. So just be prepared for me to do very little.

You-all -- I know everybody here has done a trial in front of me, but just to refresh everybody's memory, we will do individual questioning, then we will -- I think most of the time I do cause right after the person leaves the room. If we're on a tight schedule and it's taking forever, I might just save them all till the end, but we'll get rid of people who give us cause in individual questioning before we start the full panel. Then we'll bring in the full panel. We'll do a limited jury selection because I do think, with the special jury questionnaire and individual questioning, most people that can't sit as jurors on this case will already be gone. You-all know we can't do commitment questions. You can't give specific details about the case. You-all know the rules. So we'll do the whole panel, we'll send them out in the hallway, then we'll move for cause. The Government, I usually have go first. We'll do cause on the whole panel. Then I'll see if there's

anybody that the Government missed that the defense wants cause on.  And then we'll do peremptory back and forth for strikes, so it's not always the Government going first.

Any questions about jury selection procedure?  I know y'all have done it before, but from the Government, any questions about how we're going to do it?

MS. STAHL:  Just because I don't recall, Your Honor, do you start from the beginning?

THE COURT:  It's so confusing to do it the other way.  I mean, it's confusing enough.  Is that okay, we'll start with chair one?

MS. STAHL:  I much prefer it.

THE COURT:  All right.

Defense?

MS. BOOTH:  Yes, Your Honor.

THE COURT:  All right.  Okay.  Any other questions defense has about it?  Or anything else you want to talk about jury selection procedure at all?

MS. BOOTH:  No, Your Honor.

THE COURT:  We're going to refer to the defendant by his name at trial.  I know the parties are familiar with this.  I understand agents and people are not used to doing that, so it's not terrible if they do it, but inform all of your witnesses that they'll refer to the defendant by his name during trial.

How long does the Government want for its opening statement?

MS. STAHL:  I said half an hour and co-counsel said that's more than enough time, so 20 minutes.

THE COURT:  All right.  We'll do 30.  You want a five-minute warning?

MS. STAHL:  Yes.

THE COURT:  All right.  From defense?

MS. BOOTH:  Your Honor, that would be sufficient.

THE COURT:  You want a five-minute warning?

MS. BOOTH:  Yes, please.

THE COURT:  All right.  I mean, I know I've done this with all of you before, but we'll begin trial a little bit late on the first day just because we have to wait for all the jurors to assemble, but when I'm doing individual questioning, I will try to start getting the individual people in as soon as possible, so you-all be here as soon as the doors open.

Have you figured out clothing for your client, Ms. Booth?

MS. BOOTH:  Yes, Your Honor, we're working on that.

THE COURT:  I just don't want you bringing the clothing in and a juror seeing it and understanding that your client is in custody, if that's something you don't

want the jury to know.

We will have a midmorning break.  We will have a lunch break.  We will have a midafternoon break.  I will try to end on time every day.  There are some days where maybe we'll cut it a little short if there is no point in starting a new witness and days where we might go a little bit long just to get rid of a witness.  I know you-all know this, but my trials tend to move a little bit fast, so I do not want to have a break from either side.  I never want to say, Okay, it's 4:30 and we don't have another witness to go, so we're having to break till the morning.  So you have them out sitting in hallway, ready to go.

I'm not allowing speaking objections.  You guys are all experienced trial counsel, so I know you know what I mean about that.  I don't like having tons of bench conferences about things, so small things we can deal with in front of the jury because I don't think they understand a lot of that anyways, but anything long we're going to do here at the bench.

Everybody understand the JERS -- I don't know if I'm pronouncing that right -- the J-E-R-S evidence requirement where you put it on a disk?  You're all nodding "yes."

MS. BOOTH:  Yes, Your Honor.

THE COURT:  From the Government?

MS. STAHL:  Yes.

THE COURT:  So we'll get that to Ms. Chavez.  Let me make sure my clerk doesn't have anything left.

(Discussion off the record.)

THE COURT:  How many alternates does the Government want?

MS. STAHL:  I'm hesitating.  I normally would say two, Your Honor, but given the nature of the case and the strong desire to not be short a juror, I almost want to ask for three in this case.

THE COURT:  What do you think, Ms. Booth?

MS. BOOTH:  Your Honor, I have no strong opinions.

THE COURT:  Let me think about it.  How long are we set to go?

MS. STAHL:  We're set to go through August 1st, but Your Honor has --

THE COURT:  We're not going to through August 1st.

MS. STAHL:  -- said it's not going to take that long.  I think we may be able to rest as early as Monday.

THE COURT:  So your case-in-chief, how many days are you thinking for your case-in-chief?

MS. STAHL:  I think between three and -- between -- if we get a half day in on Wednesday, I think we

could be done, potentially, Monday.

THE COURT:  Let me look at a calendar.

MS. STAHL:  So that's, like, two -- between two and a half and three and a half.

THE COURT:  I mean, we're going to do jury selection in the morning.  We are going pick a jury by morning.  And then, if we -- if we start opening -- we could -- I'm happy to do one opening before lunch and one after, but, normally, it kind of seems to break where we just do openings after lunch and then we're going to start on the first witness.  So you're going to get a half day of trial for the first day.

MS. STAHL:  So based on that, I anticipate we would be able to be through the Government's case-in-chief, if not Friday, early Monday.

THE COURT:  Monday?

And what do you think, Ms. Booth?  What do you think?

MS. BOOTH:  Your Honor, as to us?

THE COURT:  For your case-in-chief, yeah.

MS. BOOTH:  One day at best, Your Honor.

THE COURT:  All right.  Well, that all sounds super reasonable.  Let me think about -- I might do three just because everybody travels so far for federal court and then, you know, but -- I don't know.  I'll think about it.

If we do three, then we have to let them know in advance, because then we have to put, like, a little -- I don't know, a little add-on thing for them to sit in, so let me think about it.  I might just do two.

Okay.  Anything else I can do for the Government?

MS. STAHL:  Your Honor, we did file a motion about the CP.  And I haven't done a case involving child exploitation images in front of Your Honor.  I just want to see how the Court prefers that we handle that.

THE COURT:  How I what?

MS. STAHL:  If you have a preference for how we handle that.  We brought in the physical exhibits today, but our intention would be to have a separate computer with those images up and ready to go.  And we would limit the time that they're displayed to, I don't know, under five seconds to try to minimize that as much as possible.

THE COURT:  I understand.  I've seen -- I've done that that way before.  I don't have a problem -- I'm going to hear from defense in a minute, but I don't see a problem with doing it that way.  One concern I do have is whatever software you-all use to show those images says something like "child exploitation unit" or something like that, like, on the screen before you go to the image.  I don't want the jury seeing that.  Do you know what I'm talking about?

MS. STAHL:  I do.

THE COURT:  Okay.

MS. STAHL:  And we have a different computer that we are borrowing from HSI --

THE COURT:  Perfect.

MS. STAHL:  -- that doesn't have that.

THE COURT:  Okay.  I just want, like, the photos themselves and then nothing about anything else.

MS. STAHL:  Understood.

THE COURT:  All right.  From defense?

MR. BENJAMIN:  Your Honor, I understand the Court has seen the photos.  And we just have an objection.  I'm still working on the objection, but I'm just asking the Court to make a determination that they've met the elements for those being CSAM or CP images before they publish them.

THE COURT:  Yeah.  We're, like, so beyond your deadline to do that.  What is your...

MR. BENJAMIN:  Understood, Your Honor.

MS. BOOTH:  Your Honor, if I may, I believe -- this was when the Court was asking if there's anything else. I believe the motion to dismiss Count 3, that's where we were essentially having our expert going and looking at the images.  We have issues with a jury -- with what they have supplied to us thus far; that's part of our Count 3 motion. And so I think that's more specifically what Mr. Benjamin is actually pointing to is the idea that they have -- that they

have met their threshold in order to present. I would note that under -- part of the Government's response is that this has been indicted; indictments are great; what's the big deal? But the Court saw the images. The jury -- the grand jury did not. Under information and belief, they did not ask to see the images, and so I think that plays into what we're raising in front of this Court now, is that we don't believe that these are sufficient. They've been -- we have information and belief to know that they've been sent to NCMEC, and have not come back as being known child pornography.

THE COURT: Let me just ask: Is that right? Are these what they call known child pornography where they know the victim and how old they were at the time?

MS. STAHL: They're not known images.

THE COURT: Just checking. Go ahead.

MS. BOOTH: They're not known images. They're not from known websites. They don't -- I know we kind of talked a little bit in vagaries, but they -- there are no searches -- the Court talked about this in some of the questioning -- the searches were not known searches that are known to give you child pornography. We're talking 800 images of child pornography. These are six that were found in this cache feed that's being supplied here, Your Honor. It's a trustworthy website. It's X, which is presumed not

to pander in child pornography.

THE COURT:  I mean, I thought before this case, but yeah.

MS. BOOTH:  Same.

THE COURT:  All right.

MS. BOOTH:  Your Honor, I do believe that's what Mr. Benjamin is just -- is coming back and circling back to. It's more specific in that motion to dismiss in that Count 3.

THE COURT:  All right.  I looked at the photos super briefly.  I think there's -- I think the age of the people in the photos -- maybe there was one that I thought looked underage, but it's hard to tell.  I know there's experts what talk about how to identify the age of people in these videos.

Go ahead and get it filed, but it's not timely, and so I might just deny it on timeliness grounds.

MS. BOOTH:  Your Honor, again, we believe that it's -- we're asking that of that Count 3.

THE COURT:  I know.  I mean, and if I dismiss Count 3, then it won't matter, right?  But as far as a foundational objection, saying these -- about the age -- that they're not relevant because they haven't laid a foundation showing the age of these people, so it's not relevant, I mean, it's just -- we're so far beyond that, but

let me look at it and we'll see.

MR. BENJAMIN:  And Your Honor, it's -- I think I have styled it as a foundation, but it's essentially a 403-type, because the issue is if we just give evidence to the jury -- and this is any evidence -- the Court's job as a gatekeeper is to say, Yes, that is admissible evidence.

THE COURT:  Yeah, right.

MR. BENJAMIN:  And so it's a 403/404-type issue, because if we're just going to say, "We can't prove that these people are underage, but we believe they're underage," and just let the jury be -- if we have people on the jury that are offended by the photos, that's not -- they're not going to meet the element that they're under 13 at the time the photo was taken and those kinds of things, Your Honor.

THE COURT:  Is that the element or is the element that he was seeking child pornography?

MR. BENJAMIN:  I think 2(b) -- go ahead, ma'am.

MS. STAHL:  Oh, excuse me.  So one of the elements that we have to prove is that the material he was attempting to access -- or knowingly access with intent to view was child pornography, which is defined as a minor under 18, and then the sexually explicit, which we've briefed extensively.  And age is a jury question.  I mean, whether they look like they're under 18 is a question for the jury.  And whether the images are sexually explicit or

contain images that are sexually explicit behavior is a jury question.

THE COURT:  Right.

MS. STAHL:  I don't know how this is -- I don't think that it's a legal issue.

THE COURT:  Yeah.

MR. BENJAMIN:  Your Honor, I think they have to be a threshold question of 18.  And I haven't found a case that says yes or no.

THE COURT:  Yeah, okay.  I'm just thinking about it.

MS. STAHL:  And just to be clear about the definitions, there's a couple ways you can get there with depictions of a minor.  If it's an actual minor -- which is a jury question.  We don't have to prove a specific minor or specific age, just that it looks like a minor -- or if it's a depiction that's indistinguishable from a minor, if there's that heightened sexually explicit conduct that's described by definition; or if they're modified to appear as an identifiable minor.  And I will just represent to the Court that we would be proceeding on, like, either of the first two definitions, but -- or descriptions of child pornography, not that these were modified to appear to be an identifiable minor.

THE COURT:  Read me the first two definitions

again that you want to rely on.

MS. STAHL:  So under 2256(8) -- let me see -- yeah, 2256(8), and then there are subsections (a), (b), and (c).  Under (a), it can be a minor, which courts have said is a jury question.  It can be an image that -- or a depiction that's indistinguishable from a minor, under (b), if that depiction includes the kind of more heightened sexually explicit -- and this is extensively briefed, but -- and then the third way is a depiction that was created or modified to appear to be an identifiable minor.  And that's not the case.  None of these are identifiable minors.

THE COURT:  Okay.  Let me just look.  All right.  So defense, your objection to it is not -- I think you said foundational when you first stood up.

MR. BENJAMIN:  Your Honor, my request is that the Court -- and forgive me, the Court has the evidence book in front of her, and I --

THE COURT:  Sherry saw it too.  Don't act like you guys haven't seen it, but go ahead.

MR. BENJAMIN:  And I've seen it and read it many times, Your Honor.

THE COURT:  All right.

MR. BENJAMIN:  But the issue is that the Court, as a gatekeeper, I think, needs to say yes or no.  It's not a -- it's not just a "we get to wave anything we want in

front of it."  And if the Court -- I'm not asking the Court to determine the age, I'm just saying the Court has to say, "Yes, I agree that that appears to be what the Government is offering it for."

THE COURT:  It's a relevancy question.  Right? Or what is it?  You tell me.

MR. BENJAMIN:  Your Honor, essentially, I keep going back to gatekeeping and I will have to find a better answer to that because I think it splits the difference between foundation and relevancy.

It's the same thing as if we had a drug case and we have white powder and the state said, "We didn't test it. We believe it looks like it, but nobody determined that it's actual cocaine."

THE COURT:  When are you going to get this filed?

MR. BENJAMIN:  I'm sorry?

THE COURT:  When are you going to get this filed? The thing you want to file on it?

MR. BENJAMIN:  Can I have till tomorrow night?

THE COURT:  Does that the work for Government, tomorrow night?

MS. STAHL:  Yes, Your Honor.

THE COURT:  How fast can you get something back to me, Ms. Stahl, on this issue?

MS. STAHL:  Tomorrow is Wednesday?  By Friday.

UNITED STATES DISTRICT COURT
100 N. Church St., Las Cruces, NM  88001
(575) 528-1430

THE COURT:  Does that work for you?

Poor thing.  All right.  5:00 P.M. on Friday.

MS. STAHL:  All right.

THE COURT:  Anything else I can do for the defense?

MS. BOOTH:  No, Your Honor.

THE COURT:  Anything else?  Oh, go ahead.  That's all right --

MS. BOOTH:  Yes, Your Honor.

THE COURT:  -- do it now.

MS. BOOTH:  Your Honor, in this new exhibit list that we have, we do have some concerns with some of the evidence that the Government wishes to bring in.  I have not had time to speak with Ms. Stahl to see if she still continues to seek those.

THE COURT:  What is it, just so I know?

MS. BOOTH:  The one that sticks out to me now was the bruise on the face.  That has now been withdrawn.  The other was a text message being done at some point between Mr. Zamarripa asking John Doe to bring him a wipe or asking John Doe to ask Jane Doe to bring him a wipe.  And that's all it is, is just two messages.  On the face of it, it's unfairly prejudicial.  We don't understand how it fits in to what they're trying to say.

THE COURT:  Tell me, did you withdraw the bruise

on the face?

MS. STAHL:  No.  I'm glad the Court clarified that.  We don't plan on using it, but we would not withdraw it as an exhibit because it could become relevant through the testimony --

THE COURT:  Okay.

MS. STAHL:  -- depending on how the cross goes.

THE COURT:  Who took that picture of the bruise on the face?

(Discussion off the record.)

MS. STAHL:  I believe it was the children's mother.  That would be Judith.

THE COURT:  Okay.  All right.

Okay.  So it might be relevant regarding the child saying that had -- he was being physically abused by the defendant.

MS. STAHL:  I think it would be more likely if they -- if the defendant's mother testifies and says she never saw any instances where the children ever had any bruises or anything.  We could cross her and say, "Did you ever see him while he had this bruise?"

THE COURT:  What about the text messages?

MS. STAHL:  Your Honor, the defense has not -- well, I guess this was a new exhibit.  I don't know that they would -- was a foundation issue --

THE COURT:  It's not a foundation issue.  She's just bringing it up as potentially relevant, so I just --

MS. STAHL:  Okay.

THE COURT:  What number is it?  Ms. Booth, do you know what number, exhibit number, it is?

MS. STAHL:  I think it's 76, Ms. Rousse tells me.

MS. BOOTH:  Your Honor, I need to be clear because now it's making -- I'm feeling like a lot of this is being put on, like, "Ms. Booth, we gave you an entire phone dump."  But the things that we are now pointing to -- this new Twitter person that they're now saying that's him, these messages, some of the things, Your Honor, are things we are just now finding out that the Government wishes to bring in.  If we are going to go through all 6,000 pages and say, "Your Honor, these are the things we want to make sure the Government doesn't intend to bring in," we're just now being noticed these on the exhibit list from yesterday.

MS. STAHL:  And I apologize, I thought it was one of the early exhibits.  It's a new one.  I will represent to the Court at least one of the minor victims specifically testified -- and this has been true from the forensic interview.  It's in the forensic interview -- about the defendant instructing her to get the wipeys.  And this is a text from the defendant to one of the minor victims, Sebastian, to go get the -- "can you tell the little girl to

go get the wipeys, V."  So it's corroborating to the kids, it's on the defendant's phone...

THE COURT:  So I guess I was confused.  Is the objection relevance or timeliness, Ms. Booth?

MS. BOOTH:  Your Honor, at this point, it's unfairly prejudicial, not relevant, and untimely.

THE COURT:  All right.  All right.  Sounds like it's probably relevant.  I don't know how it would be prejudicial, but I guess I could hear you on that.  But tell me about the timeliness issue.

MS. STAHL:  Your Honor, it was part of the discovery that was disclosed.

THE COURT:  How many pages of evidence -- I mean, she's saying 6,000 pages.  Was that, like, terabytes of evidence?

MS. STAHL:  It was extensive.  But I just want to be clear, it was disclosed early in the case because it was part of the original iCloud --

THE COURT:  What about the timeliness of it being on an exhibit list --

MS. STAHL:  Well --

THE COURT:  -- as opposed to timeliness of disclosure?

MS. STAHL:  I mean, we disclosed it yesterday, but I believe we disclosed the text messages as an earlier

part of our discovery.  We just didn't identify it specifically as an exhibit.

THE COURT:  Okay.  Why -- so what's up with the late -- why is it late as an exhibit?  Why did it make it into the exhibit list late?

MS. STAHL:  Your Honor, I don't have a good answer for that.  This is all stuff that was -- that we're -- as we're prepping witnesses, as we're talking to the kids, we kind of put pieces together and think, "Okay, we saw that in discovery, it would make --

THE COURT:  I understand.

MS. STAHL:  -- sense to explain this."

THE COURT:  So did you disclose these two things -- the text messages and the bruise of the face, did you disclose them in some way, like, other than just as part of the phone dump that you gave them?  Like, did you, like, Bates stamp them and send them over at some point?

MS. STAHL:  Yes, we did.

THE COURT:  How many pages of discovery were there?

MS. STAHL:  Let me check real quick.

THE COURT:  That's fine.

(Discussion off the record.)

MS. BOOTH:  And Your Honor, I feel like I need to retract.  I was being facetious when I said 6,000 --

THE COURT:  That's fine.

MS. BOOTH:  -- but I know the Bates stamps I have put us near 4,000, and I can't even say that's the actual Bates stamp number to be the final number.

THE COURT:  I understand.  I mean, I see paginated Bates stamp discovery as different than, you know, just when they give you this insane number of images on a phone to go through.  So that's what I'm just trying to figure out is if they just gave it to you, like, on a hard disk --

MS. BOOTH:  I just didn't want to accidentally misrepresent to the Court that there were, in fact, 6,000. I was being dramatic.

THE COURT:  Okay.  All right.  I appreciate that.

(Discussion off the record.)

MS. STAHL:  So the specific pull-out of the text messages was just disclosed on yesterday -- yesterday.

THE COURT:  When did you, though, give it as a Bates disclose -- just -- had they never seen this image ever until yesterday other than in the phone dump?

MS. STAHL:  I don't think so.  It was just disclosed as part of the phone dump previous to yesterday.

THE COURT:  All right.  Anything else that's brand-brand-new like that on the exhibit list that was just part of the phone dump and not part of the Bates stamp

discovery?

MS. BOOTH:  Your Honor, we would make the same argument for their 76 through 83.

THE COURT:  All right.  Make me a list -- let's just do this:  Make me a list of everything that you, Ms. Booth, didn't get until -- that you didn't get in, like, Bates stamp discovery or you only got it very, very recently as that and it's brand-new to the exhibit list.  Just make me a list of those things.

MS. BOOTH:  Yes, Your Honor.

THE COURT:  And then file that and tell me why it's prejudicial, and I'll let the government respond.

MS. BOOTH:  Thank you, Your Honor.

THE COURT:  Can you do that for me also by the end of business tomorrow?

MS. BOOTH:  Yes, Your Honor.

THE COURT:  And then you can respond by Friday?

MS. STAHL:  Yes, Your Honor.

THE COURT:  All right.  Okay.  Anything else?

MS. BOOTH:  No, Your Honor.

THE COURT:  Anything else from the Government?

MS. STAHL:  Just quickly, I don't think that this is necessarily necessary, but I just want to represent to the Court and to opposing counsel, we have Jana Williams on our witness list.  Like I said earlier, we don't anticipate

calling her unless somehow the herpes stuff gets out and we need her on rebuttal.  But whenever we originally filed this case, Richard Williams, her husband, who works in my office, was not in my chain of command.  He is now.  He has been essentially walled off this case since he became criminal chief and doesn't have any kind of influence on the case.  I don't think it's an issue or a conflict, but I wanted to put the Court and defense counsel on notice that we are not -- he does not control the decision-making for what happens in this case based on his wife being a witness or based on him being in my chain of command.

MR. BENJAMIN:  Your Honor, I've known Richard Williams for, I don't know, I'd say 15 years, but a good long time.  I have a practiced in the state of New Mexico. I've cross-examined his wife in Alamogordo.  His wife is my co-counsel's pediatrician.  I have no issue with Dr. Williams.

THE COURT:  All right.  I go to yoga with her too, just so you-all know.

All right.  Anything else?

MS. STAHL:  Nothing further, Your Honor.

THE COURT:  All right.  Thank you-all.

MS. STAHL:  Your Honor, I'm so sorry.  If the Court is going to -- I did bring copies of the proposed Indictment in the event that the Court wants us to supersede

to specifically allege the internet, as I briefed.  I'm sorry to...

THE COURT:  That's okay.  I'll take a copy of whatever you're looking at.  Did you give one to defense counsel?

MS. STAHL:  Yes.

THE COURT:  All right.  Thank you-all.

MR. BENJAMIN:  Thank you, Your Honor.

(The proceedings concluded at 12:19 P.M.)

UNITED STATES OF AMERICA

DISTRICT OF NEW MEXICO

CERTIFICATE OF OFFICIAL REPORTER

I, Vanessa I. Alyce Chavez, CRR, RPR, NMCCR, and Federal Official Court Reporter in and for the United States District Court for the District of New Mexico, do hereby certify that pursuant to Section 753, Title 28, United States Code, that I did report in stenographic shorthand to the best of my skill and ability the foregoing pages 1-145 of the proceedings set forth herein, that the foregoing is a true and correct transcript of the stenographically recorded proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 17th day of July 2025.

S/Electronically Filed
Vanessa I. Alyce Chavez, CRR, RPR, NMCCR
Federal Official Court Reporter
100 N. Church Street
Las Cruces, NM 88001
Phone: (575) 528-1430
Email:  Vanessa_Alyce@nmd.uscourts.gov