IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA

v.                                                                                     No. 23-CR-909-MIS

OTHON JORGE ZAMARRIPA,

    Defendant.

## ORDER DENYING IN PART AND GRANTING IN PART MOTION FOR JUDGMENT OF ACQUITTAL

    THIS MATTER is before the Court on Defendant's oral Motion for Judgment of Acquittal ("Motion"). Upon due consideration of the Parties' submissions, the record, and the relevant law the Court will **DENY** the Motion as to Counts 1 and 2 of the Fourth Superseding Indictment and will **GRANT** the Motion as to Count 3 of the Fourth Superseding Indictment.

## BACKGROUND

    For years, Defendant sexually abused his stepdaughter, Jane Doe, and his stepson, John Doe. Defendant forced the children to engage in numerous sexual acts, including oral and anal sex. Jane Doe remembers her abuse occurring from as young as three years old. To coerce the children into sexual activity, Defendant utilized a wide range of grooming practices, including showing the children pornography via the Internet.

    Defendant was first indicted in this case on June 21, 2023. Indictment, ECF No. 22. As originally indicted, Defendant was charged with two counts of knowingly persuading, inducing, and coercing a minor to engage in unlawful sexual activity, "using any facility of interstate and foreign commerce," in violation of 18 U.S.C. § 2422(b). *Id.* Count 1 pertained to Jane Doe, and Count 2 pertained to John Doe. *Id.* In June of 2024, Defendant was reindicted. Second Superseding

Indictment, ECF No. 71. The Second Superseding Indictment[1] contained the same Counts 1 and 2 as the initial Indictment but added new Counts Three and Four: using a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction thereof in violation of 18 U.S.C. §§ 2251(a), 2251(e), and 2256, one count each for Jane Doe and John Doe. *Id.* On March 4, 2025, the Government filed a Notice of Intent to Seek Superseding Indictment to Narrow Charges in which it stated its intent to obtain a superseding indictment that contained only Counts 1 and 2, not Counts 3 and 4, and that "narrow[ed] the date ranges included in Counts 1 and 2." ECF No. 87.

Shortly thereafter, the Government gained access to Defendant's iPhone. *See* United States' Resp. to Defense Mot. to Continue Trial & Extend All Related Deadlines at 4, ECF No. 130. The Government then sought "to present an additional count [to the grand jury] based on . . . new evidence" obtained from Defendant's iPhone. *Id.* at 4 n.3. As previewed, the Government filed a Third Superseding Indictment on April 16, 2025. ECF No. 136. The Third Superseding Indictment narrowed the date range for Count 1 and no longer contained the Counts 3 and 4 (violations of 18 U.S.C. §§ 2251(a), 2251(e), and 2256) contained in the Second Superseding Indictment. *Compare id.*, *with* ECF No. 71. Defendant was additionally charged in a new Count 3 with knowingly accessing with intent to view any material which contains child pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B), 2252A(b)(2), and 2256,

> that had been mailed, shipped, and transported using any means and facility of interstate and foreign commerce, and had been shipped and transported in and affecting interstate and foreign commerce, and was produced using materials which had been mailed, shipped, and transported in and affecting interstate and foreign commerce by any means, including by computer.

---

[1] The Government voluntarily dismissed the first Superseding Indictment owing to a "technical defect in the Superseding Indictment [ECF No. 62] and the sufficiency of the evidence presented to the grand jury to support a finding of probable cause." Mot. to Dismiss Superseding Indictment Without Prejudice, ECF No. 64.

Third Superseding Indictment at 2, ECF No. 136.

Defendant filed two motions to dismiss the Third Superseding Indictment on June 26, 2025: Defendant's Motion to Dismiss or in the Alternative for Bill of Particulars ("Def.'s MTD Counts 1 & 2"), ECF No. 159, and Defendant's Motion to Dismiss Count 3 of the Third Superseding Indictment, ECF No. 160. In relevant part, Defendant argued that the Third Superseding Indictment failed to provide sufficient factual allegations to establish federal jurisdiction as to Counts 1 and 2. Def.'s MTD Counts 1 & 2 at 3-6. At the Pretrial Conference held on July 8, 2025, the Government indicated that it was considering seeking a Fourth Superseding Indictment. *See* Am. Post-Hr'g Order, ECF No. 176. The Government then confirmed its intent to do so in a communication to the Court and opposing counsel. In light of this information, on July 10, 2025, the Court denied without prejudice Defendant's motion to dismiss Counts 1 and 2. Order Den. Without Prejudice Mot. to Dismiss or in the Alternative for Bill of Particulars, ECF No. 180. With regard to Defendant's argument that the Third Superseding Indictment failed to properly allege that he used a facility of interstate commerce in the commission of the crimes charged in Counts 1 and 2, the Court noted that to the extent that certain Tenth Circuit opinions "may offer guidance on drafting jurisdictional allegations, the Government may wish to include additional jurisdictional allegations in the Fourth Superseding Indictment." *Id.* at 9 (first citing *United States v. Chavarria*, No. 23-2102, 2025 WL 1680479 (10th Cir. June 16, 2025); then citing *United States v. Schaefer*, 501 F.3d 1197 (10th Cir. 2007); then citing *United States v. Sturm*, 672 F.3d 891 (10th Cir. 2012); and then citing *United States v. Kroeker*, No. 24-3060, 2025 WL 1878790 (10th Cir. July 8, 2025)).

The Government filed a Fourth Superseding Indictment on July 16, 2025. ECF No. 188. Given the centrality of the indictment language, the Court reproduces the entirety of the charges here:

Count 1

From on or about January 1, 2018, and continuing to on or about December 19, 2022, in the District of New Mexico and elsewhere, the defendant, **OTHON JORGE ZAMARRIPA**, using any means or facility of interstate and foreign commerce, including a computer, an interactive computer service, a cellular phone, and the Internet to access sexually explicit materials to knowingly persuade, induce, entice, and coerce any individual who had not attained the age of 18 years, Jane Doe, to engage in any sexual activity for which any person could be charged with a criminal offense.

In violation of 18 U.S.C. § 2422(b).

Count 2

From on or about January 1, 2018, and continuing to on or about December 19, 2022, in the District of New Mexico and elsewhere, the defendant, **OTHON JORGE ZAMARRIPA**, using any means or facility of interstate and foreign commerce, including a computer, an interactive computer service, a cellular phone, and the Internet to access sexually explicit materials to knowingly persuade, induce, entice, and coerce any individual who had not attained the age of 18 years, John Doe, to engage in any sexual activity for which any person could be charged with a criminal offense.

In violation of 18 U.S.C. § 2422(b).

Count 3

Beginning on an unknown date and continuing to on or about January 15, 2023, in the District of New Mexico, the defendant, **OTHON JORGE ZAMARRIPA**, knowingly accessed with intent to view any material which contains child pornography, as defined in 18 U.S.C. § 2256(8), that had been transported using any means and facility of interstate and foreign commerce including by a computer, an interactive computer service, a cellular phone, and the Internet, and had been transported in and affecting interstate and foreign commerce including by a computer, an interactive computer service, a cellular phone, and the Internet, and was produced using materials which had been mailed, shipped, and transported in and affecting interstate and foreign commerce by any means, including by a computer, an interactive computer service, a cellular phone, and the Internet.

> In violation of 18 U.S.C. §§ 2252A(a)(5)(B), 2252A(b)(2), and 2256.

*Id.* This case proceeded to trial on July 23, 2025. During trial, issues pertaining to the interstate commerce element of Counts 1 and 2 were raised several times. Following one such occasion, on July 24, the Court issued an Order stating as follows:

> In a bench conference during trial today, Defense counsel provided the Court with a cite for a case that counsel asserts stands for the proposition that use of the internet is not sufficient to establish the instrumentality of interstate commerce prong of the Government's charges. The case provided by Defendant is a First Circuit case, and therefore not itself particularly useful to the Court. *United States v. O'Donovan*, 126 F.4th 17 (1st Cir. 2025). However, the Court previously brought several relevant Tenth Circuit opinions to the Parties' attention and noted that those cases may be instructive here. Order Denying Without Prejudice Mot. to Dismiss or in the Alternative for Bill of Particulars at 9 nn. 4-6, ECF No. 180 (citing *United States v. Sturm*, 672 F.3d 891 (10th Cir. 2012); *United States v. Kroeker*, No. 24-3060, 2025 WL 1878790 (10th Cir. July 25, 2025)). The Parties shall file briefs addressing the issue of whether Defendant's use of the internet alone is sufficient for the "using any means or facility of interstate and foreign commerce" element of the charges, and in particular the Tenth Circuit cases the Court has raised. Briefs are due by **Friday, July 25, at 8:30am**.

ECF No. 207. Both Parties filed timely responses. United States' Resp. to Court's Order 207, ECF No. 208; Def.'s Mem. Regarding Lack of Internet as Instrumentality of Interstate Commerce, ECF No. 209.

The Government rested on July 25. At that time, Defendant made an oral motion for judgment of acquittal as to all three counts pursuant to Federal Rule of Criminal Procedure 29. The Court took Defendant's motion under advisement and reserved ruling. *See* Fed. R. Crim. P. 29(b). On July 28, the jury returned a verdict of guilty on all counts.

## DISCUSSION

### I. Legal Standard

Rule 29 provides that "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense

for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Defendants advancing Rule 29 challenges "bear[ ] a heavy burden." *United States v. Almaraz*, 306 F.3d 1031, 1040 (10th Cir. 2002). Courts reviewing Rule 29 motions consider only "whether, taking the evidence—both direct and circumstantial, together with reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt[,]" and therefore do no engage in an independent factfinding process that weighs the evidence or evaluates the credibility of witnesses. *United States v. Baldridge*, 559 F.3d 1126, 1134 (10th Cir. 2009) (internal quotation marks and citation omitted).

**II.     Analysis**

    *A.     Counts 1 and 2*

Defendant combined his Rule 29 argument for Counts 1 and 2.[2] As to those charges, Defendant argued that the mere use of the Internet was insufficient to meet the interstate commerce element. *See generally* Def.'s Mem. Regarding Lack of Internet as Instrumentality of Interstate Commerce, ECF No. 209; Def.'s MTD Counts 1 & 2, ECF No. 159. Specifically, Defendant asserted that "simply because a phone, computer or other device is present is not sufficient to create federal jurisdiction for counts 1 and 2[,]" Def.'s MTD Counts 1 & 2 at 4, and that "even if the phone was used to show videos the government must provide evidence that the cellular phone was used in a manner that satisfies the jurisdictional element of the statute[,]" *id.* at 5.

---

[2] Defendant did not actually make any argument on his Motion as to Counts 1 and 2. Defendant began his argument with Count 3. Before he moved on to Counts 1 and 2, the Court directed the Government to respond to his Count 3 argument so as to keep the lines of argumentation clear. The Government responded as to Count 3, then made its own argument as to the "jurisdictional hook"—that is, the link to interstate commerce—for Counts 1 and 2. The Court then inquired if there was anything else from Defendant. Defendant asked the Court if there was "anything [he] need[ed] to clarify." The Court responded no, but that he could argue if he wished. Defendant stated, "Your Honor, we've briefed it and I've argued it. If there's anything to clear up, other than that no, your Honor."

Title 18, United States Code, Section 2422, subsection (b) states:

> Whoever, *using the mail or any facility or means of interstate or foreign commerce*, or within the special maritime and territorial jurisdiction of the United States knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title and imprisoned not less than 10 years or for life.

(emphasis added). Thus, the elements of a Section § 2422(b) offense are: "(1) us[ing] a facility of interstate commerce (2) to knowingly persuade, induce, entice, or coerce (3) any individual who has not attained the age of 18 years, (4) to engage in any sexual activity for which any person can be charged with a criminal offense, or attempted to do so." *United States v. Munro*, 394 F.3d 865, 869 (10th Cir. 2005) (citation modified). Throughout his briefing, Defendant appears to have erroneously conflated the interstate commerce requirements of 18 U.S.C § 2422 and 18 U.S.C. § 2252. Contrary to Defendant's assertions, the two requirements are meaningfully distinct. Title 18, United States Code, Section 2252A states:

> Any person who . . . knowingly possesses, or knowingly accesses with intent to view, any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer . . . shall be punished as provided in subsection (b).

18 U.S.C. § 2252A(5)(B). Whereas Section 2252A by its plain language apparently requires that the relevant material be transported in, or affect, interstate commerce, Section 2422 requires only that the commission of the offense use a facility or means of interstate commerce.

The Government points to *Utah Lighthouse Ministry v. Foundation for Apologetic Information & Research*, 527 F.3d 1045, 1054 (10th Cir. 2008), and *United States v. Morgan*, 748 F.3d 1024, 1033 (10th Cir. 2014), as standing for the proposition that the Internet is, as a matter of

law, an instrumentality of interstate commerce. Although neither case addresses Section 2422, they are nonetheless instructive. *Utah Lighthouse* concerned an alleged violation of the Lanham Act. 527 F.3d at 1050. The plaintiff argued that the fact that a website was at issue made the contested trademark a commercial use under the Lanham Act. *Id.* at 1054. In rejecting that argument, the Tenth Circuit reasoned that several federal district courts had held that "the use of a trademark on the Internet satisfies . . . the jurisdictional requirement" of the Act, but other facts besides "mere use of the Internet" established the trademark's connection with goods and services. *Id.* The Tenth Circuit agreed with those courts, stating, "[w]e agree that the Internet is generally an instrumentality of interstate commerce, and thus that the jurisdiction of the Lanham Act constitutionally extends to unauthorized uses of trademarks on the Internet." *Id.* (citation omitted).

In *Morgan*, the defendants were convicted of using an "instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense [of kidnapping]." 748 F.3d at 1033. On appeal, the defendants challenged the district court's jury instruction that defined an instrumentality of interstate commerce to include a cellphone, the Internet, and a GPS tracker. *Id.* The Tenth Circuit held that the district court did not plainly err in giving the instruction. *Id.* at 1034. The court stated, first, "[w]e have decided the Internet is an instrumentality of interstate commerce." *Id.* at 1033 (quoting *Utah Lighthouse*, 527 F.3d at 1054). Although the Tenth Circuit had not previously decided whether a cell phone or GPS tracking device is such an instrumentality, they reasoned, the district court's decision to decide the issue as a matter of law was not plainly erroneous. *Id.* at 1034. The court continued, "When, as here, certain items have been deemed instrumentalities as a matter of law, the only fact question left for the jury is whether the Defendants used them." *Id.*

Although the Tenth Circuit has yet to address the issue head-on, *Utah Lighthouse* and *Morgan* strongly suggest that the Internet also constitutes a "means or facility of interstate commerce" for purposes of Section 2422(b). This conclusion is bolstered by caselaw from sister circuits. At least four other circuit courts of appeals have squarely decided that use of the Internet constitutes "use of a facility of interstate commerce" under Section 2422(b). *See, e.g.*, *United States v. Barlow*, 568 F.3d 215, 220-21 (5th Cir. 2009) ("[Section] 2422(b) [does not] require[] proof of travel across state lines. Section 2422(b) requires the *use of* 'any facility or means of interstate or foreign commerce.' . . . In 2009, it is beyond debate that the Internet and email are facilities or means of interstate commerce. And, it is undisputed that [the defendant] conducted his entire [offense] online . . . . The interstate nexus requirements of the statute[] w[as] satisfied[.]"); *United States v. Fuller*, 77 F. App'x 371, 379 (6th Cir. 2003) ("[T]he interstate commerce connection was established in this case by indisputable evidence that [the defendant] used both the Internet and the telephone, facilities or means of interstate commerce, in committing the offense."); *United States v. Rajab*, 23 F.4th 793, 796 (8th Cir. 2022) (noting the internet "is a facility of interstate commerce"); *United States v. Hornaday*, 392 F.3d 1306, 1311 (11th Cir. 2004) ("The internet is an instrumentality of interstate commerce."); *cf. United States v. D'Amelio*, 683 F.3d 412 (2d Cir. 2012). Defendant does not cite, and the Court's research has not found, any case in which any federal court has reached the opposite conclusion.[3]

---

[3] The Court is cognizant of the Tenth Circuit's recent decision in *United States v. Chavarria*, 140 F.4th 1257 (10th Cir. 2025). *Chavarria* does not require a contrary conclusion in this case. First, *Chavarria* by its plain terms "hold[s] only that 'motor vehicles'—an undefined, generic term—are not per se instrumentalities of interstate commerce[.]" *Id.* at 1268. *Chavarria* was not about, and indeed did not even mention, the Internet. But, even if one were to read *Chavarria*'s reasoning and implications more broadly, it would not reach the Internet. The Internet is meaningfully distinct from motor vehicles. As the Supreme Court wrote more than a quarter-century ago, "[t]he Internet is an international network of interconnected computers[,]" representing "a unique and wholly new medium of worldwide human communication." *Reno v. ACLU*, 521 U.S. 844, 849-50 (1997) (internal quotation omitted). Unlike motor vehicles, the Internet by its very nature inherently comprises cross-state activity. The Internet is much more similar in nature to trains and aircraft—which *Chavarria* distinguishes as "permit[ting] the reasonable inference that they are per se instrumentalities of interstate commerce"—than it is to motor vehicles. 140 F.4th at 1265-66. The

9

The Government clearly adduced sufficient evidence to demonstrate Defendant's guilt as to the interstate commerce element of Counts 1 and 2. As to Count 1, at trial, Jane Doe testified that on one occasion that she could remember, Defendant called her into his bedroom and used his PlayStation (connected to a TV) to access the web browser DuckDuckGo, from which he navigated to a website called X-VIDEOS, and played a pornographic video depicting the cartoon characters Princess Daisy and Princess Peach engaging in sexual acts.

As to Count 2, John Doe testified at trial that Defendant showed him pornography obtained from the Internet on numerous occasions—"easily 30 times, maybe more." In particular, John Doe recalled one incident in which Defendant called John Doe from John Doe's room to the living room where Defendant had his PlayStation. Defendant used the PlayStation to access the Internet, then navigated to PornHub and showed Defendant a video of "a male and female having sex." Defendant asked John Doe if he liked it. Sometimes, John Doe testified, Defendant would use the Incognito Mode feature of the web browser Chrome to show John Doe pornography on Defendant's computer and phone. Defendant also showed John Doe pornography featuring a particular porn actress, whom Defendant recommended to John Doe. John Doe's testimony on this matter was supported by physical evidence in the form of a screenshot of John Doe's phone showing a conversation with Defendant in which Defendant stated the actress's name. John Doe testified that on another occasion, while showing John Doe a pornographic video, Defendant removed his own pants and instructed John Doe to start doing what the actors were doing in the

---

Tenth Circuit has itself previously likened the Internet to rail and highway traffic. *ACLU v. Johnson*, 194 F.3d 1149, 1162 (10th Cir. 1999); *see also* Kenneth D. Bassinger, *Dormant Commerce Clause Limits on State Regulation of the Internet: The Transportation Analogy*, 32 Ga. L. Rev. 889, 904 (1998) (quoted and cited in *Johnson*, 194 F.3d at 1162) ("The structure of the Internet bears a striking resemblance to a railroad, highway, or other means of interstate transportation."); *United States v. MacEwan*, 445 F.3d 237, 245 n.8 (3d Cir. 2006) (stating that the internet, "much like a bridge, railroad, highway, or airplane, . . . constitutes an instrumentality of interstate commerce"); *United States v. Horne*, 474 F.3d 1004, 1006 (7th Cir. 2007) (noting that a particular website "is an avenue of interstate commerce, like an interstate highway or long-distance telephone service").

video—namely, John Doe touching Defendant's penis. At another time, Defendant used his computer to access the website X-VIDEOS through Chrome Incognito, showed John Doe pornography on that website, and told John Doe to masturbate. John Doe also testified about an occasion on which Defendant anally penetrated John Doe after showing John Doe a pornographic video. John Doe further testified that Defendant used Defendant's computer, PlayStation, and phone, as well as John Doe's phone, to access the Internet to show John Doe pornography on sites such as PornHub and X-VIDEOS. Jane's and John Doe's testimonies were further corroborated by evidence obtained from the extraction of Defendant's iPhone, which showed that the Defendant had numerous tabs open in the DuckDuckGo browser for searches and videos on PornHub and X-VIDEOS.

The foregoing evidence is more than sufficient for a reasonable jury to conclude that Defendant was guilty beyond a reasonable doubt of "using . . . any facility . . . of interstate or foreign commerce" to knowingly entice a minor to commit an unlawful sex act. 18 U.S.C. § 2422(b). As discussed above, use of the Internet is adequate to establish the interstate commerce element of Section 2422. Here, evidence pertaining to both Count 1 (Jane Doe) and Count 2 (John Doe) shows that Defendant used the Internet to show the minor victims pornography. Additionally, Officer Max Weir, an officer with the Las Cruces Police Department, testified that Defendant's iPhone was manufactured in China. John Doe testified that Defendant sometimes used his iPhone to show John Doe pornography. This provides an alternate manner by which the interstate commerce element is satisfied for Count 2.

Although Defendant did not raise this issue, for the sake of completeness the Court briefly notes that the evidence was also sufficient as to the enticement element of Counts 1 and 2. The Government called Supervisory Special Agent Daniel O'Donnell, the unit chief of a specialized

unit that focuses on crimes against children at the FBI. Agent O'Donnell was qualified as an expert in grooming and testified as a blind witness (meaning that he did not know details about the facts of this case). Agent O'Donnell testified at length about grooming behaviors that child sex offenders use to exploit and manipulate children for the purposes of sexual activity. As particularly relevant here, Agent O'Donnell testified that child sex offenders use pornography (including adult pornography) as a grooming practice to lower a child victim's inhibitions. According to Agent O'Donnell, an offender may use pornography to "decipher what might be arousing" to a child, "to normalize sexual behaviors," or to demonstrate certain types of sexual activities to the child. Agent O'Donnell also testified that grooming is "a dynamic process involving a constellation of behaviors" and that "the totality of . . . various clusters of behaviors . . . are utilized by certain types of child sex offenders to manipulate, coerce, or exploit children for sexual purposes."

As discussed above, Jane Doe testified that Defendant showed her pornography on one occasion. Although Jane Doe testified that nothing sexual happened at that specific time because she got up and left the room while the pornography was playing, she also testified that this pornography incident occurred when she was ten years old, at a time when sexual things were happening with Defendant often—a couple of times a week. Taking this evidence in the light most favorable to the Government, a reasonable jury could have concluded that Defendant used the pornography in order to entice or coerce Jane Doe into engaging in sexual activity with him. Per Agent O'Donnell's expert testimony, a reasonable juror could have inferred that Defendant used the pornography as a grooming behavior to normalize sexual behaviors to Jane Doe and/or demonstrate a particular sexual activity to Jane Doe. Jane Doe testified that the pornographic video showed to her by Defendant depicted two cartoon characters, Princess Daisy and Princess Peach, using a "magic wand" to "take turns turning into guys and putting their penis into each other's

butt." Jane Doe further testified that the things the characters were doing were things that Defendant would do to Jane Doe (that is, anal penetration). It is reasonable to conclude, therefore, that Defendant showed Jane Doe this video in order to normalize and/or demonstrate that sexual behavior to her. Indeed, Defendant identified no other possible reason for why he would have shown his very young stepdaughter pornography, and the Court can think of none.

As for John Doe, the evidence that Defendant used the pornography in order to coerce or entice John Doe into sexual activity is overwhelming. John Doe's testimony revealed that Defendant undertook an extensive and methodical process of using pornography to groom John Doe. John Doe testified that the first time Defendant showed John Doe pornography, he asked John Doe if he liked it and recommended a particular adult performer to him. As time went on, and Defendant continued showing John Doe pornography, Defendant began coercing John Doe into sexual activity. The first time John Doe remembers something sexual happening with Defendant, he and Defendant were watching a pornographic video and Defendant pulled down his own shorts and instructed John Doe "to start doing . . . what they were doing in the video." Defendant told John Doe to touch Defendant's penis—the same behavior shown in the video—while they watched the video. On another occasion that same year, Defendant showed John Doe pornography and instructed Defendant to touch Defendant in the manner depicted in the video and to masturbate himself. John Doe also testified about a later occasion when Defendant showed him pornography, then sexually assaulted him immediately thereafter. John Doe testified that Defendant eventually performed on John Doe all the sexual acts depicted in the pornography Defendant showed him, including oral sex and anal penetration. Together with Agent O'Donnell's testimony that offenders use pornography to discern a child's sexual preferences, lower their inhibitions, and demonstrate

sex acts, this evidence is more than sufficient for a reasonable factfinder to conclude that Defendant committed the enticement elements of Counts 1 and 2.

Accordingly, Defendant's Motion for Judgment of Acquittal is denied as to Counts 1 and 2.

B.   Count 3

As to Count 3, Defendant argued that there was no evidence explaining that, and how, Defendant actually interacted with the six alleged child pornography images found in Defendant's Twitter[4] cache file on his phone. Further, Defendant asserted, there was no evidence to suggest that he was actively pursuing child pornography material. Defendant also points out that the images were cached from Twitter, a "legitimate" site. In response, the Government argued that the images' appearance on Defendant's Twitter feed demonstrated access, and circumstantial evidence demonstrated Defendant's intent to view. Specifically, the Government argued that Defendant's intent was demonstrated by evidence of his sexual abuse of children, Jane and John Doe, his use of an apparent alias account, and his searches on that account that included terms such as "tiny teen."[5]

The Court agrees with Defendant. Viewing the evidence in the light most favorable to the Government, there was insufficient evidence for a reasonable jury to convict Defendant on Count 3. Count 3 charges Defendant with "knowingly access[ing] with intent to view any material which contains child pornography" in violation of 18 U.S.C. §§ 2252A(a)(5)(B), 2252A(b)(2), and 2256. Fourth Superseding Indictment at 2. Section 2252A(a)(5)(B) "requires an offender to meet at least the following elements: (1) he must knowingly access *some* proscribed material; (2) he must intend

---

[4] The website formerly known as Twitter is now known as "X." However, because it was still known as Twitter at the times relevant to the case, the Court will refer to it as such throughout this Order.

[5] Defendant also made, and the Government responded to, arguments as to the interstate commerce element of Count 3 and the actual age of the persons depicted in the alleged child pornography. Because the Court finds a judgment of acquittal warranted on other grounds, it need not reach these issues.

14

to view that material; and (3) he must know that the material contains an image of child pornography." *United States v. Brune*, 767 F.3d 1009, 1020 (10th Cir. 2014). The dispute here centers on the second element: Defendant's intent to view.

The bulk of the direct evidence on this matter came in the form of testimony from Officer Max Weir. Officer Weir is an officer with the Las Cruces Police Department who specializes in digital forensics. He was qualified as an expert in cellphone forensics. Officer Weir completed the extraction of Defendant's iPhone. Officer Weir testified that, as part of the extraction, he found some 700 images located in a cache folder for the Twitter app. According to Officer Weir, a cache folder is a temporary location on the phone where the app stores images and videos as they appear on the user's Twitter feed so that such media can be displayed to the user. The use of cache files allows the app to speed things up when loading and displaying content. Cache files are not saved by the user. Officer Weir testified that of the 700 images found in the Twitter cache folder, a little over 200 were pornographic. Of those 200, Officer Weir identified six images that appeared to depict child pornography. Officer Weir further testified that the images in the Twitter cache folder had all been created (which is to say, cached) on January 15, 2023.

Officer Weir was also the source of some circumstantial evidence on this issue. Officer Weir testified that the images located in the cache folder were associated with a Twitter account with the name "Toasty4struddel"—an account separate from Defendant's other Twitter account, which was publicly associated with him (i.e. used his name, Othon Zamarripa). The Toasty4struddel account was apparently used to look at pornography, whereas the Othon Zamarripa account was not. Agent Stephanie Legarreta, the Department of Homeland Security Investigations case agent, also testified about the Toasty4studdel account. Agent Legaretta testified that the Toasty4Struddel account bore the username "Raquel Garcia," contained a profile picture

depicting a woman, and stated in the information for the profile, "A lady with lots of ambition that is horny most of the time." The Toasty4struddel account also contained posts by the user requesting nude photos from other users. Agent Legaretta testified that one way people look for child pornography online is by using alias accounts, and that Defendant's use of an alias account (Toasty4struddel) led her to believe that Defendant was looking to view child pornography.

Officer Weir additionally testified as to open tabs in the DuckDuckGo web browser app found on Defendant's iPhone. Specifically, Officer Weir (along with evidence from the extraction) testified that the open tabs contained URLs for pornography websites with language including "thick teen," "hot tiny teen," "flexy teen," "pretty girl . . . [expletive meaning intercourse] by creepy stepgrandpa," "sexy trans teen," and "Snow White." These tabs were created in October of 2022.

Taken together, this evidence is insufficient for a reasonable jury to conclude that Defendant is guilty beyond a reasonable doubt as to Count 3. Although the Government need not prove that Defendant actually viewed the child pornography, it must prove that Defendant intended to view child pornography. It has not done so. This case differs from other intent-to-view cases by the nature of the website—Twitter—where the child pornography was located. In *United States v. Ammons*, for example, the defendant was convicted of knowingly accessing with intent to view material containing child pornography based on 220 images of child pornography found in the Defendant's Google Chrome cache folder. 806 F. App'x 378, 380 (6th Cir. 2020). The defendant argued that, because they were in the cache, it is possible they were stored there without him actually viewing the material. *Id.* at 382. Even conceding that point, the Sixth Circuit concluded that there was sufficient evidence for a reasonable jury to find the defendant guilty. *Id.* at 383. The court reasoned that evidence in that case had established that the defendant had installed Tor to

access the dark web, where he had encountered child pornography—federal agents testified that websites on the dark web must be intentionally sought out. *Id.* Evidence also showed that the defendant had admitted to browsing internet forums that directed readers where to look on Tor to find child pornography, and that the defendant had visited a website with "jailbait" in the title. *Id.* As another example, in *United States v. Solomon*, the district court concluded that the evidence was sufficient to sustain a conviction where the evidence established that child pornography images found in the defendant's cache folder were saved there from webpages with titles that included child pornography-related terms. Case No. 3:22-CR-00022-ART-CSD, 2025 WL 1169132, at *5-6 (D. Nev. Apr. 21, 2025).

In the instant case, by contrast, the images were found in Defendant's Twitter cache—they seemingly appeared in Defendant's Twitter feed. Although there may be some child pornography on Twitter, it is certainly not known primarily for that purpose. Unlike in other cases where defendants access known child pornography websites, the mere fact that Defendant knowingly accessed Twitter does not establish that he did so with the intent to view child pornography. *Cf. Brune*, 767 F.3d at 1023 ("Most users of the Internet are likely aware that child pornography exists on the Internet. Under Brune's broad interpretation of the statute, these innocuous Internet patrons, fully aware that the 'Internet' contains child pornography somewhere in its disreputable underworld, would form the necessary intent to violate the statute the moment they logged on to access the Internet. That is not an obvious interpretation of the text, and reading it that way violates our duty to interpret a statute where fairly possibly so as to avoid substantial constitutional questions." (internal quotation marks and citation omitted)). Nor is the circumstantial evidence adduced by the Government sufficient to demonstrate intent. The child pornography images were few among many more adult pornography images, all cached from Defendant's Twitter feed on

the same day. The evidence relating to the Toasty4Struddel account establishes, at best, that Defendant was seeking out adult pornography on Twitter. Nothing on the account, besides the cached images, links the account to child pornography. The DuckDuckGo searches are also not clear evidence of Defendant's seeking child pornography. Teens can, of course, be over the age of 18. The evidence, therefore, was insufficient for a reasonable jury to have concluded beyond a reasonable doubt that Defendant is guilty on Count 3, and Defendant's motion is granted as to Count 3.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Judgment of Acquittal is **DENIED** as to Counts 1 and 2 and **GRANTED** as to Count 3.

*/s/ Margaret Strickland*
**MARGARET STRICKLAND**
UNITED STATES DISTRICT JUDGE